James D. **HODGSON**, Secretary of Labor, United States Department of Labor, Plaintiff-Appellant,

v.

The **PROPHET COMPANY**, a corporation, Defendant-Appellee.

No. 72–1138.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Sept. 11, 1972.

Decided Jan. 10, 1973.

Carin Ann Clauss, Associate Sol. (Richard F. Schubert, Sol. of Labor, Donald S. Shire, Sylvia S. Ellison, Holloway Wooten, Attys., and Major J. Parmenter, Regional Sol., on brief) for plaintiff-appellant.

A. P. Murrah, Jr., Oklahoma City, Okl., for defendant-appellee.

Alexander E. Wilson, Jr., Alexander E. Wilson III, and Wilson, Wilcox & Wilson, Atlanta, Ga., on brief for National Restaurant Assn., as amicus curiae.

Before PHILLIPS, HILL and HOLLOWAY, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge.

James D. Hodgson, as United States Secretary of Labor,[1] brought this action under § 17 of the Fair Labor Standards Act of 1938,[2] as amended,[3] to enjoin The Prophet Company[4] from violating §§ 6 and 7 of such Act, as amended.[5]

From an adverse judgment, the Secretary has appealed.

Northern Oklahoma College, a State-owned junior college, is located in Tonkawa, Oklahoma. The number of students enrolled in the summer of 1968 was 299; in the fall of 1968–1969, 1202; in the spring of 1968–1969, 1108; in the summer of 1969, 250; in the fall of 1969–1970, 1338; in the spring of 1969–1970, 1134; in the summer of 1970, 208; in the fall of 1970–1971, 1325; and in the spring of 1970–1971, 1266.

Prophet is a corporation. Its corporate name is Prophet Foods Company. At all times here pertinent, it engaged in the business of managing and operating institutional and industrial cafeterias and food dispensing services at many locations throughout the United States.

For a number of years prior to June 24, 1966, until the time the college, on that date, entered into the contract hereinafter referred to with Prophet, the college had maintained and operated in one of its buildings a cafeteria where its students, faculty members, guests, and others could purchase and eat meals. It also maintained and operated in the building a snack bar where items usually carried by snack bars were sold for cash.

About seven years before the date of the trial, on June 22, 1971, the college had constructed on its campus a new building, and thereafter used it for the operation of the cafeteria and snack bar, for banquets, dances, and as a gathering place for students and for other purposes.

In order to insure patronage of its cafeteria in sufficient amount to warrant its maintenance and operation, the college had adopted the following plan. At the beginning of each four-month semester of the school year, it required students who lived in dormitories or in other college-owned rooming facilities, if they lived on the campus seven days per week, to pay a stated amount per day for 20 meals per week, only two meals being served on Sunday; and if they went home over weekends, a stated amount per day for 15 meals per week. Such students were permitted, if they so desired, to pay such amounts at the beginning of each month of a semester. Such plan was referred to as the "contract boarding plan," and will so be referred to hereinafter.

On June 24, 1966, the college entered into a contract with Prophet, by the terms of which Prophet was to maintain, "manage and operate" as "an independent contractor" and "upon its own credit," the "food services, snack bar, special functions and any and all food service, as required by the college" and to do so "in the space allotted to it" in such new building. And Prophet "was to obtain in its own name and at its expense * * * all necessary permits, insurance, and licenses for the conduct of the business." In addition thereto, by the terms of the contract Prophet was to furnish all foods, beverages, materials of every kind "and all management and labor necessary for the efficient operation of said catering service; to furnish all routine janitor service in the dining areas, kitchen, storeroom"; to "be responsible at its own expense for the replacement of expendable items such as glassware, flatware and chinaware"; to keep "the catering service open and maintain adequate service * * * at such hours as College and Prophet" might from time to time mutually determine, and to "submit menus for approval at least one week in advance of service to such person as the College may designate."

1. Hereinafter referred to as the Secretary.

2. 29 U.S.C.A. § 201.

3. 29 U.S.C.A. §§ 201–219, inclusive.

4. Hereinafter referred to as Prophet.

5. 29 U.S.C.A. §§ 206, 207.

By the terms of the contract, Prophet agreed to "use necessary student help" at the regular campus student wage scale, and "pay" such "students" directly and to use "only employees acceptable to the College"; that it would not hire employees of "the College during the period of the contract and for one year thereafter without the specific consent of the College"; that at the expiration of the contract it would return the food service premises and all equipment furnished to Prophet by the college in the condition in which they were received, except for ordinary wear and tear.

And by the terms of such contract, the college agreed to furnish space in the new building for the preparation and serving of food to its "students, staff and guests." Parenthetically, we may here observe that while the contract does not specifically mention the furnishing of food service to the public, Prophet solicited patronage by the public by advertisements and otherwise, which advertisements were submitted to and approved by the president of the college before their publication, and it served members of the general public who sought food service at its establishment. Moreover, Olin Walcher, director of finance of the college, testified that Prophet's establishment had "the privilege of providing meals, banquets and so on for outsiders. That is a part of the standing operating agreement between the College and Prophet."

The college further agreed to furnish all facilities, completely equipped and ready to operate. Such facilities included all means, utensils and containers for cooking or otherwise preparing food for serving to customers, cutlery, dishes, glassware, and means for dispensing and serving such food to customers.

It further agreed at its own expense to furnish all heat, fuel, refrigeration, utilities, and hot and cold water reasonably required for efficient operation. It further agreed, at its own expense, to clean the windows, walls, ceilings, and light fixtures, and to maintain the building and keep all mechanical cafeteria equipment in good operating condition. It further agreed to deliver any food which Prophet provided to students, school employees, or faculty members in the infirmary.

It further agreed to require all of its students living in dormitories or other college-owned rooming facilities to be on the contract boarding plan and to provide them with an identification card. The college retained the privilege of using the cafeteria dining area at times when it would not interfere with the food service operation. Prophet's resident manager and the college were to mutually agree upon the times such facilities would be available for college use.

And the college agreed that when dances or other such events were held in cafeteria dining facilities, it would at its own expense perform necessary janitor service and return the facilities in a sanitary and satisfactory manner to Prophet.

The college agreed to require that all students living in college dormitories or other college-owned rooming facilities should be on the contract boarding plan.

The contract provided that all monies received by Prophet from sales from the snack bar and all monies received by Prophet from sales of food at the cafeteria, other than those received from boarding students, and all monies received by Prophet from sales of food at special events, such as banquets, club meetings and the like, should belong to Prophet, and that it should pay to the college 10 per cent thereof. Such 10 per cent included monies received from general public patrons.

It provided that Prophet should charge boarding plan students requiring a maximum of 20 meals per week, or fraction thereof (two meals on Sunday), $1.68 each per day; that it should charge boarding plan students requiring a maximum of 15 meals per week, Monday through Friday, $1.75 each per day, and that the college should remit the aggregate of such charges collected by it from boarding plan students monthly to Proph-

et. No deductions were to be made for meals missed by a contract boarding student.

And it further provided the prices that Prophet should charge all nonboarding students, faculty members, and guests for weekday breakfasts, lunches, dinners, and Sunday dinners, and special meals like buffets, chuck wagon suppers, steak dinners, and banquets. Such meals were to be sold on a cash basis and Prophet was to remit 10 per cent thereof to the college. No prices were specified for meals sold to public patrons, but Prophet also remitted 10 per cent of the amounts received therefor to the college.

It was stipulated that Prophet's annual dollar sales volume of goods and services by its establishment at the college was less than $250,000; and the trial court found that more than 50 per cent of the business of such establishment was done in Oklahoma, the state in which it was located.

The trial court found the facts substantially as we have stated them, and its findings are sustained by the evidence and are not clearly erroneous.

The Act of Congress fixing minimum wages and maximum hours for persons "engaged in commerce or in the production of goods for commerce" was enacted in 1938, and may be cited as the "Fair Labor Standards Act of 1938." See § 1, 52 Stat. 1060; § 6, 52 Stat. 1069; § 7, 52 Stat. 1063. It was amended several times, but we will refer to and consider only the amendments pertinent to questions presented on this appeal.

The first of such amendments was enacted in 1949, 63 Stat. 910 et seq. On October 5, 1948, the United States District Court for the Northern District of Ohio decided the case of McComb v. Factory Stores Co. of Cleveland, D.C.Ohio, 81 F.Supp. 403. In that case, the court held that "employees of" a "cafeteria and canteens on" the "premises of" a "large steel mill were engaged in" a "process or occupation necessary to" the "production of goods for commerce so as to be entitled to" the "protection of" the "Fair Labor Standards Act and were not ex-

empt from the act as employed in" a "local retailing capacity or in" a "retail or service establishment, where" the "cafeteria and canteens promoted" the "productive ability of" the "steel mill employees and were part of" the "mill's integrated system of efficient steel production and were not furnished merely for" the "convenience of" the "steel mill employees."

The decision in that case and kindred cases in a large measure engendered the 1949 amendment.

Prior to the 1949 amendment, § 3(b) of the Act read:

"'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof."

The 1949 amendment, Act of October 26, 1949, § 3(a), substituted the word "between" for "from" following the words "States or" and the word "and" for "to" preceding "any place."

Prior to the 1949 amendment, § 3(j) of the Act read:

"'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this Act an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any closely related process or occupation necessary to the production thereof, in any State."

The 1949 amendment inserted the words "closely related" preceding the word "process" and substituted the words "directly essential" for the word "necessary" following the word "occupation." As so amended, § 3(j) read:

"'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this Act an employee shall be deemed to have been engaged in the production of goods if

such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any closely related process or occupation directly essential to the production thereof, in any State."

In addition to amending the coverage provision of the Act, the 1949 amendment amended § 13(a)(2), the definition of a "retail or service establishment," as follows:

"A 'retail or service establishment' shall mean an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry;  *  *  *"

That definition remains unchanged in the Act today. See 29 U.S.C.A. § 213 (a)(2).

The Act does not specifically define the term "establishment." However, it is defined in regulations promulgated by the Secretary (29 C.F.R. 779.23), as follows:

"§ 779.23   *Establishment.*

"As used in the Act, the term 'establishment', which is not specially defined therein, refers to a 'distinct physical place of business' rather than to 'an entire business or enterprise' which may include several separate places of business.  This is consistent with the meaning of the term as it is normally used in business and in government, is judicially settled, and has been recognized in the Congress in the course of enactment of amendatory legislation  *  *  *."

█   Hence, for the purposes of determining whether Prophet was exempted from the minimum wage and overtime provisions of the Act, with respect to its employees at its food service business in the college building, such establishment will be regarded as a distinct physical place of business, rather than a part of Prophet's entire business or enterprise, which includes several places of business and will hereinafter be referred to at times as Prophet's local establishment.

Congress again amended the Act in 1961, Pub.L. 87–30, 29 U.S.C.A. § 213. The part of such amendment here pertinent reads:

"The provisions of sections 206 and 207  *  *  *  shall not apply with respect to—

*        *        *        *        *

"(2) any employee employed by any retail or service establishment, more than 50 per centum of which establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located, if such establishment—

"(i) is not in an enterprise described in section 203(s) of this title,  *  *  *

*        *        *        *        *

"A 'retail or service establishment' shall mean an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry;  *  *  *

*        *        *        *        *

"(4) any employee employed by an establishment which qualifies as an exempt retail establishment under clause (2) of this subsection and is recognized as a retail establishment in the particular industry notwithstanding that such establishment makes or processes at the retail establishment the goods that it sells: *Provided,* That more than 85 per centum of such establishment's annual dollar volume of sales of goods so made or processed is made within the State in which the establishment is located;  *  *  *

*        *        *        *        *

"(20) any employee of a retail or service establishment who is employed primarily in connection with the preparation or offering of food or beverages for human consumption, either on the premises, or by such services as catering, banquet, box lunch, or curb or counter service, to the public, to em-

ployees, or to members or guests of members of clubs; * * * "

The Act was again amended by the Act of September 23, 1966, Pub.L. 89–601, 80 Stat. 830, 835–837, 841, 842, 29 U.S.C.A. §§ 203, 206, 207, 213, 214, 218.

In § 203(r) the term "enterprise" is redefined, as follows:

" 'Enterprise' means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise *by an independent contractor*: * * *." [6] (Italics ours.)

Section 13(a) of the Act, as amended in 1966, 29 U.S.C.A. § 213(a), in part here pertinent, reads:

"§ 213.   *Exemptions*

"(a) The provisions of sections 206 and 207 of this title shall not apply with respect to—

*     *     *     *     *

"(2) any employee employed by any retail or service establishment (except an establishment * * * engaged * * * in the operation of a hospital, institution, or school described in section 203(s)(4) of this title), if more than 50 per centum of such establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located, and such establishment is not in an enterprise described in section 203(s) of this title *or* such establishment has an annual dollar volume of sales which is less than $250,000 (exclusive of excise taxes at the retail level which are separately stated). A 'retail or service establishment' shall mean an establishment 75 per centum

of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry; * * * " (Italics ours.)

Section 3(s) of the Act, as amended in 1966, 29 U.S.C.A. § 203(s), in part here pertinent, reads as follows:

"§ 203.   *Definitions*

As used in this chapter—

*     *     *     *     *

"(s) 'Enterprise engaged in commerce or in the production of goods for commerce' means an enterprise which has employees engaged in commerce or in the production of goods for commerce, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person, and which—

*     *     *     *     *

"(4) is engaged in the operation of * * * an institution of higher education * * *."

The evidence clearly shows that the operation under the contract clearly comes within the annual dollar volume of sales prescribed in § 213(a)(2).

The 1966 amendment of the Act by § 13(a), 29 U.S.C.A. § 213(a), repealed § 13(a)(20) of the 1961 amendment, which made §§ 6 and 7 of the Act, 29 U.S.C.A. §§ 206 and 207, inapplicable to "any employee of a retail or service establishment who is employed primarily in connection with the preparation or offering of food or beverages for human consumption, either on the premises, or by such services as catering, banquet, box lunch, or curb or counter service, * * *." But by its § 13(b)(18) it restored the application of § 7 (the maximum hour provisions) to such employees.

■   The question arises as to whether Congress by repealing § 13(a)(20) of the 1961 amendment, insofar as it made § 6 of the Act inapplicable to "any employee of a retail or service es-

---

6.  Prophet conceded it was an enterprise, within the meaning of 3(r) and (s) of the Act (29 U.S.C.A. § 203(r) and (s)).

tablishment who is employed primarily in connection with the preparation or offering of food or beverages for human consumption, either on the premises, or * * *" thereby made § 6 of the Act (the minimum wage provision) applicable to any of its employees so "employed by any retail or service establishment * * * if more than 50 per centum of such establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located, and such establishment is not in an enterprise described in section 3(s) of this title *or* such establishment has an annual dollar volume of sales which is less than $250,-000 * * *." (Italics ours.)

It will be noted that the statute uses the disjunctive "or" between the clause "and such establishment is not in an enterprise described in section 3(s) of this title" and the clause which follows, which indicates it provided alternatives.

Moreover, we are of the opinion that Congress by the repeal of such § 13(a)(20) did not intend to make § 6 of the Act applicable to any employee so employed by any small retail service establishment described in § 13(a)(2) of the 1966 amendment. This is clearly shown by two statements in Conference Report No. 2004, September 6, 1966, [To accompany H.R. 13712] Cong. Record Vol. 112 (1966), 2 U.S.Code Cong. & Adm. News, pp. 3002, 3013, in two succeeding paragraphs. One of such paragraphs, in part here pertinent, reads:

"The bill (the 1966 amendment) repeals sections 13(a)(19) and 13(a)(20) which provide minimum wage and overtime exemptions * * * *for food service employees in retail establishments.* Section 13(b) of the act is * * * amended to maintain the overtime exemption for *food service employees in retail or service establishments.*" (Italics ours.)

The other of such paragraphs, in part here pertinent, reads:

"Employees of small retail or service establishments (except * * * certain institutions and schools) which have annual dollar volumes of sales of goods or services of less than $250,000 and which do more than 50 per cent of their business within the State in which they are located, are exempted from the minimum wage and overtime provisions of the act. This establishment exemption applies to * * * *retail food service establishments* * * *." (Italics ours.)

It will be noted that the Conference Committee in the paragraph of its Report No. 2004, first quoted above, in adverting to the repeal by the 1966 amendment of § 13(a)(20) of the 1961 amendment, which exempted "any employee of a retail or food service establishment who is employed primarily in connection with the preparation or offering of food or beverages for human consumption" from both the minimum wage and maximum hours provisions of the Act, referred to such employees so exempted as *"food service employees in retail establishments."* (Italics ours.) It will be further noted that the Conference Committee in such paragraph, in adverting to § 13(b)(18) of the 1966 amendment, which provided that "any employee of a retail or service establishment who is employed primarily in connection with the preparation or offering of food or beverages for human consumption" was exempt from the maximum hour or overtime provisions of the Act, referred to such employees so exempted as *"food service employees in retail or service establishments."* (Italics ours.) It will also be noted that the Conference Committee in the paragraph of its Report No. 2004, last quoted above, stated that employees of small retail or service establishments which have annual dollar volumes of sales of goods or services of less than $250,000, and which do more than 50 per cent of their business within the state in which they are located, are exempted from the minimum wage and overtime provisions of the Act. It will be further noted that the Conference Committee, in order to make it clear that Congress intended to include in such ex-

emptions of such small retail or service establishments their employees "employed primarily in connection with the preparation or offering of food or beverages for human consumption," added to the paragraph: "This establishment exemption applies to * * * *retail food service establishments." (Italics ours.)*

It is significant that in referring to employees so employed "primarily in connection with the preparation or offering of food or beverages for human consumption" in the first paragraph, they twice do so by the phrase, "food service employees in retail establishments" and in the last quoted paragraph, in referring to such employees so primarily employed, they use the phrase, *"retail food service establishments."* (Italics ours.)

■ The key words used in both paragraphs are "food service," "establishments," and "retail." The rule is well settled that the same words used in clauses or sentences of a document will be construed to have been used in the same sense, unless the context indicates the contrary.[7] Here, the context indicates that they were used in the same sense.

Hence, we conclude that since Prophet's employees were engaged primarily in the preparation and offering of food and beverages for human consumption, they were exempt from the minimum wage and maximum hours or overtime provisions of the Act, if Prophet met the other requirements of § 13(a)(2) of the 1966 amendment of the Act.

It was stipulated that Prophet's annual dollar volume of sales at its establishment in the college building in Oklahoma in each of the years here involved (1967 to 1970) was substantially less than $250,000, and the evidence clearly shows that more than 50 per cent of its annual volume of sales of goods and services in those years at such establishment was in Oklahoma, the state in which it was located.

■ The Secretary contends that Prophet sold to the college the food and beverages which Prophet agreed in the contract to furnish boarding students at the cafeteria, at the prices stipulated in the contract for boarding students on the 15 meal per week plan and for boarding students on the 20 meal per week plan; and that the college resold such food and beverages to the boarding plan students at a greater price per day, which a witness for the college testified was $2.30 per day.

The subject matter of the sale to each boarding student was the food and beverages which he was entitled to receive at Prophet's establishment, as shown by the identification card. Such food and beverages were purchased and paid for by Prophet, were cooked or otherwise prepared for human consumption by Prophet, and were served directly by Prophet to the boarding house students at the cafeteria.

All the college did with respect thereto was to collect from each boarding student at the beginning of each semester or the first day of each month in the semester, depending on which plan of payment the student adopted, the amounts the contract stipulated Prophet was entitled to receive for three meals per day on weekdays and two meals on Sundays from the boarding students, and remit the same to Prophet. In other words, all the college did was to act in the role of a collection agent, rather than a purchaser.

The college also collected from each boarding student and retained the difference between $2.30 per day and the price per day Prophet was entitled to receive. Obviously, that was to provide the major portion of the compensation the college

---

7.  Gonzales v. Barber, 9 Cir., 207 F.2d 398, affirmed 347 U.S. 637, 74 S.Ct. 822, 98 L.Ed. 1009; Sampsell v. Straub, 9 Cir., 194 F.2d 228, cert. denied, 343 U.S. 927, 72 S.Ct. 761, 96 L.Ed. 1338; United States v. Gertz, 9 Cir., 249 F.2d 662; Schooler v. United States, 8 Cir., 231 F.2d 560. The cases we cite refer to the construction of statutes, but we think the same rule would apply to a Committee Report with respect to a statute, which reflects the meaning of such statute.

was to receive for the space it furnished in its building to carry on Prophet's establishment, and for the use by Prophet of the equipment, utensils, and other things used by it in preparing and serving food and beverages, and also for the furnishing by the college to Prophet of refrigeration of food and storage space for food.

It is readily apparent that it was more convenient to each boarding student, to Prophet, and to the college for the latter to collect the full amount of $2.30 per day from each of such students and remit to Prophet the portion thereof that Prophet was entitled to receive from each of such boarding students for meals to be furnished by Prophet to such students, than for the college to collect only the difference between $2.30 per day and the amount per day Prophet was to receive for such meals, and require each boarding student to pay Prophet the amount it was entitled to receive for the meals to be furnished by it to such students.

It is true the contract provided that menus should be submitted by Prophet to the college for approval. But since the college was obligated by the contract to require its boarding students to eat at the cafeteria operated by Prophet, the college had an implied obligation to see to it that the menus provided food for, and that embraced all the nutritive elements essential in the diet of, young and active college students. Hence, such requirement was normal and required no more with respect to the food Prophet served than Prophet was impliedly obligated to do under the contract. It also required Prophet to operate and maintain the service in accordance with all laws, ordinances, regulations and rules of federal, state, and local authority, and to comply with the standards of safety and health established by the college. Such requirements were also for the protection of the boarding students who were required by the college to eat at the cafeteria.

Finally, the contract required Prophet to comply with all rules and regulations of the college. The reason for that is

clear. The new building was utilized by the college for dances, banquets and like affairs, at times mutually agreed to by it and Prophet's local manager, and it was also used as a gathering place for students. Hence, it was essential that the college promulgate and enforce rules and regulations for conduct by the students and others who frequented the building, to maintain proper order and protect the building and other property of the college from harm, and it was obviously equally important that the employees of Prophet's local establishment also comply with such rules and regulations.

We are of the opinion that neither the method of payment followed nor any of the requirements above set out, when viewed in the light of all the established relevant facts and circumstances, militate against the conclusion that all of Prophet's sales at the cafeteria were at retail.

■ Hence, we hold that Prophet's employees were employed by a retail and service establishment, within the meaning of § 13(a)(2) of the 1966 amendment, 29 U.S.C.A. § 213(a)(2).

For the convenience of the reader, with respect to what follows, we repeat certain provisions of § 13 of the 1966 amendment to the Act, 29 U.S.C.A. § 213.

Section 13(a)(2) insofar as here pertinent reads:

"(a) The provisions of sections 6 and 7 of this title, (29 U.S.C.A. §§ 206 and 207) shall not apply with respect to—

\* \* \* \* \* \*

"(2) any employee employed by any retail or service establishment (except an establishment or employee engaged \* \* \* in the operation of a hospital, institution, or school described in section 3(s)(4) of this title (29 U.S.C.A. § 203(s)(4)), if more than 50 per centum of such establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located, and such establishment is not in an en-

terprise described in section 3(s) of this title (29 U.S.C.A. § 203(s)) *or such establishment has an annual dollar volume of sales which is less than $250,000 (exclusive of excise taxes at the retail level which are separately stated)*. A 'retail or service establishment' shall mean an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry; * * *" (Italics ours.)

Section 3(s) of the 1966 amendment, 29 U.S.C.A. § 203(s), in part here pertinent, reads:

"(s) 'Enterprise engaged in commerce or in the production of goods for commerce' means an enterprise which has employees engaged in commerce or in the production of goods for commerce, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person, and which—

"(1) during the period February 1, 1967, through January 31, 1969, is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level which are separately stated) * * * and beginning February 1, 1969, is an enterprise whose annual gross volume of sales made *or* business done is not less than $250,000 (exclusive of excise taxes at the retail level which are separately stated); (Italics ours.)

* * * * * *

"(4) is engaged in the operation of a hospital * * * an elementary or secondary school, or an institution of higher education (regardless of whether or not such * * * school is public or private or operated for profit or not for profit."

■ The use of the disjunctive conjunction *or* between the clause "and such

establishment is not in an enterprise described in section 3(s) of this title" and the clause "such establishment has an annual dollar volume of sales which is less than $250,000 (exclusive of excise taxes at the retail level which are separately stated)" casts doubt on whether the provisions in such § 13(a)(2) which precede such disjunctive conjunction *or* have an application in the instant case.

That Congress intended alternatives is confirmed by the statement quoted above from Conference Committee Report No. 2004, September 6, 1966, that a small establishment, if more than 50 per cent of its dollar volume of sales of goods or services is made within the state in which it is located, and if such establishment has an annual dollar volume of sales which is less than $250,000, is exempt from the minimum wage and overtime provisions of the Act.

We conclude that Prophet's local establishment falls within the second alternative.

However, Prophet's local establishment is subject to the provision "except an establishment or employee engaged * * in the operation of a * * * institution, or school described in section 3(s)(4)" of the 1966 amendment. The only institution or school described in § 3(s)(4) here applicable is "an institution of higher education."

■ Hence, the question is whether Prophet's local establishment was engaged in the operation of the college. We conclude it was not, for the reasons we will now state.

By the terms of the contract, Prophet agreed to operate on its own credit and at its own risk of loss a general "catering service" in the space allotted to it in the new building of the college and to manage and operate such service. Parenthetically, we may state that Clane Kirtley, Dean of Students at the college, testified that Richard Voss, who was employed and paid by Prophet's local establishment to manage the operation of the food service of such establishment, actually did manage such establishment

and its operation, and that the college did not.

By the terms of the contract, Prophet's local establishment further agreed to obtain in its own name and at its own expense all necessary permits and licenses for the conducting of such business in its local establishment, and to carry in its own name and at its expense all insurance required to be carried by the operator of such food service; to furnish all foods, beverages, and materials of every kind, and all management and labor necessary for the efficient operation of said catering service; to provide at its own expense all routine janitor service in the dining areas, kitchen, storerooms, and snack bar areas; and to be responsible at its own expense for the replacement of expendable items, such as glassware, flatware, and chinaware.

Since the college was required in effect, as it had done in the past, to require each boarding student to eat and pay for his meals, either five days or seven days per week in each week of a semester, depending on which plan the student adopted, there was an implied obligation imposed on the college to require Prophet's local establishment to furnish meals sufficient in amount and embracing all the nutritive constituents essential to provide a proper diet for such boarding students; and it was also an implied duty of the college to require employees of Prophet's local establishment to comply with adequate standards of cleanliness, safety, and health protection for its students.

Also, by the contract the college was required to furnish space, equipment, utensils, and all other things needed for a proper operation of the food services by Prophet's local establishment.

But none of those things detracted from the fact that Voss managed the operation of the food services; that such establishment purchased and paid for the food served; and that its employees cooked or otherwise prepared the food and beverages for human consumption and directly served them to its food patrons, all in accordance with the terms of the contract.

In other words, Prophet's local establishment owned, managed, operated, and carried out the food service, and served the food directly to the students, members of the college faculty, guests, and members of the public. In so doing, we do not think it can be said that Prophet's local establishment operated an institution of higher education.

Accordingly, the judgment is affirmed.