2013 COA 45

**CITY OF GOLDEN, a Colorado home rule municipal corporation, and Jeff Hansen, in his official capacity as Finance Director for the City of Golden, Plaintiffs–Appellants,**

v.

**ARAMARK EDUCATIONAL SERVICES, LLC, a Delaware Limited Liability Company; Barbara Brohl, in her official capacity as Executive Director of the Colorado Department of Revenue; and Timothy T. Weber, in his official capacity as Executive Director of the Colorado Department of Revenue, Defendants–Appellees.**

**Court of Appeals No. 12CA0088**

Colorado Court of Appeals,
Div. VII.

Announced March 28, 2013

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2012.

Williamson & Hayashi, LLC, David S. Williamson, Mary Lynn Benham, Boulder, Colorado, for Plaintiffs–Appellants.

Baker and Hostetler LLP, Laurin D. Quiat, Raj Chohan, Denver, Colorado, for Defendant–Appellee Aramark Educational Services, LLC.

Opinion by Judge HAWTHORNE

¶ 1 This case concerns a sales tax assessment levied by the City of Golden (Golden) on food sales made by Aramark Education Services, LLC (Aramark), on the Colorado School of Mines (CSM) campus. Plaintiffs, Golden and Jeff Hansen, in his official capacity as Golden's Finance Director, appeal the district court's summary judgment for defendant, Aramark.[1] Because we conclude that Aramark's sales were not exempt from taxation, we reverse the summary judgment and remand the case to the district court to reinstate the assessment.

## TABLE OF CONTENTS

I. Background
II. Standard of Review
III. Exemption for "Wholesale Sales"
  A. Relevant Law
    1. Golden Municipal Code Provisions
    2. Cases Concerning Wholesale Versus Retail Sales
  B. Analysis
    1. Food Purchases on CSM Campus Using Cash, Checks, Credit Cards, or Debit Cards
    2. Food Purchases Using Burro Bucks or Gold Money
    3. Food Provided as Part of Meal Plan Meals, Munch Money, or Summer Camp and Summer Conference Meals
IV. Exemption for Direct Sales to CSM in Its "Governmental Capacit[y] Only"
  A. Direct Sales
  B. Statutory Power to Rent, Lease, Maintain, Operate, and Purchase Buildings and Facilities for Dining
  C. Educational Process

## I. Background

¶ 2 The CSM and Aramark entered into a Food Services Management Agreement (FSMA) in which they agreed that Aramark would be the exclusive operator of the food service facilities in the CSM Student Center, including the residential dining hall and the Food Court, as well as the I–Club and other mutually agreed upon food service facilities. During the time period at issue in this case, Aramark operated the Slate Café, the I–Club, the Food Court, Java City, Mines Park Convenience Store, and CSM concessions.

¶ 3 Pursuant to the FSMA, Aramark provides all the food for the CSM food service facilities, staffs the facilities, pays the employees, prepares the food, serves the food, operates the registers, collects payment, and manages the facilities. No CSM representative ever handles or takes possession of the food either before or after it reaches the facilities. The FSMA further provides that the receipts Aramark collects from the non-meal plan food sales belong to Aramark, and Aramark shall pay CSM a 5% or 10% commission on the receipts, depending on the facility in which the sales are made.

---

1. The other two defendants listed in the case, Barbara Brohl, in her official capacity as Executive Director of the Colorado Department of Revenue, and Timothy T. Weber, in his official capacity as Chief Hearing Officer of the Colorado Department of Revenue, did not participate in this appeal.

¶ 4 The food that Aramark serves on CSM's campus generally falls into any one of six categories: (1) food served in the residential dining hall that is part of semester-long meal plans that students are required to purchase if they live on the CSM campus; (2) food served in the residential dining hall that is part of semester-long meal plans that faculty, staff, and non-residential students have the option of purchasing; (3) food served in the residential dining hall that is part of meal plans purchased by those attending summer conferences or camps on the CSM campus, who are not CSM students; (4) food purchased at the non-residential food service facilities using Munch Money, which is essentially money that CSM adds to the campus ID cards of those who purchase meal plans to allow them to eat at the non-residential food service facilities as part of their meal plan; unspent Munch Money expires at the end of each month, like the unused meal plan meals; (5) food purchased at the non-residential food service facilities using Burro Bucks or Gold Money[2], which is money that campus ID cardholders can add to their campus IDs regardless of whether they purchased a meal plan and which allows their campus IDs to function as debit cards; like cash, and unlike Munch Money, Burro Bucks and Gold Money do not expire; and (6) food purchased on campus using cash, checks, credit cards, and debit cards.

¶ 5 Golden levies a sales tax on all sales of tangible property that occur in Golden, including food, unless specifically exempted under the Golden Municipal Code (GMC). GMC §§ 3.03.030(a)(4), (a)(7), (o). Aramark, however, only collects and remits sales tax on CSM campus food sales that are made with cash, checks, credit cards, or debit cards. Aramark contends the other sales fall within the exemptions set forth in the GMC for (1) wholesale sales and (2) direct sales to state institutions "in their governmental capacities only." GMC § 3.03.010(a)(7), (13). Golden disagrees that these sales are exempt. Accordingly, Golden assessed Aramark sales tax on the other food sales it made on CSM's campus.

¶ 6 Aramark protested the assessment and received a hearing before Golden's Finance Director. In a written decision, the Finance Director upheld the assessment. Aramark then appealed the assessment to the Colorado Department of Revenue, pursuant to section 29–2–106.1, C.R.S.2012. After a hearing, the Deputy Director issued a ruling that reversed Golden's assessment.

¶ 7 Golden appealed to the Denver District Court by filing a complaint and notice of appeal, pursuant to sections 29–2–106.1 and 39–21–105, C.R.S.2012. After conducting discovery, the parties stipulated to numerous facts and then filed cross-motions for summary judgment. The district court entered summary judgment in Aramark's favor.

¶ 8 Golden filed a motion to amend the judgment and findings in its favor. Because the court did not rule on the motion within sixty days, it was deemed denied. C.R.C.P. 59(j).

¶ 9 Golden appeals the summary judgment and the denial of its post-trial motion.

## II. Standard of Review

¶ 10 We review de novo a district court's grant of summary judgment, as well as its interpretation of a municipal code. *Ball Aerospace & Tech. Corp. v. City of Boulder*, 2012 COA 153, ¶ 8, 304 P.3d 609. We also review tax assessment appeals de novo. § 29–2–106.1(7), C.R.S.2012; *Catholic Health Initiatives Colorado v. City of Pueblo*, 207 P.3d 812, 817–18 (Colo.2009).

¶ 11 Generally, when interpreting tax statutes, we resolve doubts against the government and in favor of the taxpayer. *Noble Energy, Inc. v. Colo. Dep't of Revenue*, 232 P.3d 293, 296 (Colo.App.2010). "However, this presumption is reversed when the taxpayer claims a statutory *exemption* from taxation." *Id.* When tax exemptions are at issue, we must construe them narrowly and

---

**2.** The briefs refer to this payment method in various ways, as either Gold Money, Gold Card, or Gold Dollars. For simplicity, we refer to it as Gold Money. Additionally, the briefs and the record—including the factual stipulation—do not make clear how Gold Money differs from Burro Bucks, other than that Gold Money no longer exists. Accordingly, we treat Gold Money as equivalent to Burro Bucks.

in favor of the taxing authority. *Catholic Health Initiatives Colorado*, 207 P.3d at 817. Thus, we presume that taxation is the rule and that exemption from taxation is the rare exception. *Colorado Dep't of Revenue v. City of Aurora*, 32 P.3d 590, 591 (Colo.App. 2001); *Noble Energy, Inc.*, 232 P.3d at 296.

¶ 12 The burden is on the one claiming an exemption to clearly establish the right to such relief. *Catholic Health Initiatives Colorado*, 207 P.3d at 817. We resolve any reasonable doubts against the tax exemption. *Id.* at 818.

### III. Exemption for "Wholesale Sales"

¶ 13 Golden contends that the district court erred in concluding that Aramark's food sales on the CSM campus are wholesale sales.[3] Specifically, Golden argues that Aramark engages in retail food sales to the CSM students, faculty, staff, and guests, and that CSM simply acts as its collection agent and landlord in collecting the payment. Aramark counters that it sells the food to CSM on a wholesale basis, and CSM resells the food to the students, faculty, staff, and guests. Thus, Aramark asserts that the sales are exempt under the GMC as wholesale sales. GMC § 3.03.010(a)(13).

¶ 14 We conclude that when individuals purchase food from Aramark-operated food service facilities on CSM's campus using cash, checks, credit cards, debit cards, Burro Bucks, and Gold Money, Aramark is making retail sales to the customers, which are subject to Golden's sales tax. However, the question is far closer when the food is provided as part of a CSM meal plan or a summer conference or summer camp meal plan, or by using Munch Money. As to these transactions, Golden's arguments have sufficient merit to engender reasonable doubts that Aramark is entitled to the wholesale sales exemption. Because we must construe exemptions narrowly and resolve any reasonable doubts against the exemption, we resolve the issue in Golden's favor. *Catholic Health Initiatives Colorado*, 207 P.3d at 818; *Noble Energy*, 232 P.3d at 296.

### A. Relevant Law

#### 1. Golden Municipal Code Provisions

¶ 15 Golden levies a 3% sales tax on all sales of tangible personal property and services, including food, unless expressly exempted. GMC §§ 3.03.010, 3.03.030(a)(4), 3.03.040. Regarding food sales, the GMC provides that the sales tax applies to "all sales of food, prepared food, or food for immediate consumption." GMC § 3.03.030(a)(4).

¶ 16 Moreover, as relevant here, Golden exempts from its sales tax "[a]ll wholesale sales." GMC § 3.03.040(a)(13). Golden defines "wholesale sales" as "sales to licensed retailers, jobbers, dealers or wholesalers for resale. Sales by wholesalers to consumers are not wholesale sales. Sales by wholesalers to non-licensed retailers are not wholesale sales." GMC § 3.03.010(iii).

¶ 17 Finally, the GMC provides that "[e]very retailer engaged in business in the city shall be liable and responsible for payment of an amount equal to the taxable sales multiplied by the rate established by Section 3.03.010." GMC § 3.04.010. Thus, although individual consumers must pay Golden's municipal sales taxes, the end retailers are responsible for collecting and remitting the tax to the city. *See id.*; *City of Aurora*, 32 P.3d at 590–93 (noting that although a vendor must charge the consumer or user the applicable sales or use tax, the vendor remains liable for paying the tax).

#### 2. Cases Concerning Wholesale Versus Retail Sales

¶ 18 In *A.B. Hirschfeld Press, Inc. v. City & County of Denver*, 806 P.2d 917, 918–26 (Colo.1991), the supreme court adopted the primary purpose test for determining whether, under the Denver Municipal Code, a purchase is "for resale" and is therefore part of an exempt "wholesale sale." Under the primary purpose test, a wholesale sale occurs only if the purchaser's primary pur-

**3.** Golden's complaint alleges that Aramark owes sales tax, pursuant to GMC section 3.03.030(a)(4), on its *food* sales on the CSM campus. Accordingly, we do not discuss Aramark's tax liability for non-food sales.

pose in acquiring the item is to resell it in an unaltered and basically unused condition. *Id.* at 920–21. The court in *A.B. Hirschfeld Press* concluded that when a commercial printing company buys materials it needs for producing the final products ordered by its customers, such purchases are not wholesale purchases. *Id.* at 923–24. A printing company's primary purpose in buying the materials is to perform its contractual obligations to its customers and not simply to resell them in an unaltered and basically unused condition. *Id.*

¶ 19 In *Regional Transportation District v. Martin Marietta Corp.*, 805 P.2d 1102, 1105 (Colo.1991), the supreme court applied the primary purpose test to determine, under Colorado's sales and use tax statutes, whether a purchase is part of a wholesale sale or a retail sale. The court concluded that a defense contractor's purchases of testing and tooling equipment were not wholesale purchases because the company's primary purpose in making the purchases was for use in performing its contractual obligations and not for resale. *Id.*

¶ 20 In *Hodgson v. Prophet Co.*, 472 F.2d 196, 198–207 (10th Cir.1973), the Tenth Circuit Court of Appeals held that, for purposes of the overtime and minimum wage provisions of the Fair Labor Standards Act, a food service company that operated a college's dining facilities was engaging in retail sales.

¶ 21 The company provided, prepared, and served the food in the college's dining facilities. *Id.* at 198–99. The company also operated the facilities, including hiring and paying the staff. The college required all students who lived in the dormitories to purchase from the college a semester-long meal plan that included a fixed number of meals each week. *Id.* Although the company collected payment for food sold to individuals who were not a part of the residential meal plan, the college collected payment from those students who purchased the fixed meal plans. *Id.* at 199. The company paid the college a fixed commission on the receipts it collected from the non-meal plan food sales. *Id.*

¶ 22 The court concluded that, although the students paid the college—and not the company—for their meal plans, the college was merely acting as a collections agent and not a purchaser. *Id.* at 204. Thus, the company provided the food to the diners on a retail basis. *Id.* at 204–05.

## B. Analysis

### 1. Food Purchases on CSM Campus Using Cash, Checks, Credit Cards, or Debit Cards

■ ¶ 23 When students, faculty, staff, or guests purchase food on the CSM campus using cash, checks, credit cards, or debit cards, Aramark is conducting direct retail sales to the consumers. In such instances, the food and the payment are transferred directly between Aramark and the consumers. *Cf. Hodgson*, 472 F.2d at 197–200. CSM does not collect any payment. *Cf. id.* Although CSM owns the facilities, it is not otherwise part of the sale. *Cf. id.* Moreover, nothing in the record indicates that the consumers purchase the food for anything other than their own use and consumption. *See A.B. Hirschfeld Press*, 806 P.2d at 920–21 (a sale is at retail if the property is acquired primarily for the purchaser's own use or consumption).

¶ 24 Accordingly, Aramark properly collects and remits sales tax on such purchases.

### 2. Food Purchases Using Burro Bucks or Gold Money

■ ¶ 25 When CSM ID holders make food purchases on campus using Burro Bucks or Gold Money, Aramark is also conducting a direct retail sale. Unlike with the meal plan meals, purchasers do not have a contract with CSM to purchase any particular type or quantity of food. Indeed, the FSMA provides that all receipts from the sales belong to Aramark, and CSM is entitled only to a fixed commission on the sale. Moreover, although CSM must remit payment for such sales to Aramark, CSM has no other involvement with the transactions. Thus, CSM functions purely as Aramark's collections agent in collecting and remitting the purchaser's individual payments on Aramark's behalf. *See Hodgson*, 472 F.2d at 204–05.

¶ 26 Accordingly, the food purchases made with Burro Bucks and Gold Money are retail transactions and not wholesale transactions. *See id.*

### 3. Food Provided as Part of Meal Plan Meals, Munch Money, or Summer Camp and Summer Conference Meals

¶ 27 It is a far closer question whether Aramark's provision of food as part of semester-long meal plans, summer conference and summer camp meal plans, and Munch Money purchases are wholesale sales that Aramark makes to CSM for resale, or whether they are retail sales that Aramark makes directly to the end consumers. We conclude that Golden's arguments on this question are sufficient to engender reasonable doubts that Aramark is entitled to the wholesale sales exemption. Because we must resolve any reasonable doubts against the exemption, we therefore conclude that Aramark is not entitled to the wholesale sales exemption for these sales. *See Catholic Health Initiatives Colorado*, 207 P.3d at 817–18; *Noble Energy, Inc.*, 232 P.3d at 296.

¶ 28 As an initial matter, we note that we treat food purchases made with Munch Money as equivalent to meals provided through the meal plans because Munch Money is provided only to meal plan purchasers as part of their meal plans, and unlike Burro Bucks or Gold Money, unused Munch Money expires just as unused meal plan meals expire. We also treat meals provided to summer camp and summer conference attendees as equivalent to meals provided as part of the semester-long meal plans. The record indicates that such meals are provided as part of meal plans akin to the semester-long meal plans.

¶ 29 To determine whether Aramark has met its burden of clearly establishing its entitlement to the wholesale sales exemption, we first review the parties' arguments and then consider whether, in light of the arguments, we have any reasonable doubts that Aramark is entitled to the wholesale sales exemption. *See Catholic Health Initiatives Colorado*, 207 P.3d at 817.

¶ 30 Aramark argues that these transactions are wholesale sales because:

- The FSMA expressly provides that Aramark will provide "meals, including a la carte items and alcoholic beverages" for CSM "*to resell* to its students, faculty, staff and guests on this campus." (Emphasis added.)
- Under the reasoning of *A.B. Hirschfeld Press*, Aramark and CSM were quintessential wholesale sellers and buyers. CSM's only purpose in purchasing the meals from Aramark was to resell them to their students, faculty, staff, and guests in an unaltered and unused condition. Unlike the companies in *A.B. Hirschfeld Press* and *Martin Marietta*, CSM was under no obligation to alter the meals before reselling them, nor did CSM use the meals in any way before reselling them. Thus, they were wholesale sales transactions. *Cf. Martin Marietta Corp.*, 805 P.2d at 1105; *A.B. Hirschfeld Press, Inc.*, 806 P.2d at 923–24.
- CSM's physical control over the food is not a requirement for a wholesale sale.
- The contract between Aramark and CSM was a classic requirements contract. *Black's Law Dictionary* defines a "requirements contract" as "[a] contract for the sale of goods under which the buyer makes periodic payments and the seller retains title to or a security interest in the goods." *Black's Law Dictionary* 372 (9th ed. 2009).
- The meal plan contracts were between CSM and its students, faculty, and staff. Aramark was not in privity with the students, faculty, or staff.
- *Hodgson* is inapposite because it is a labor case, and not a tax case, in which the court was determining whether the minimum wage and overtime requirements of the Fair Labor Standards Act applied. *Hodgson*, 472 F.2d at 198. *Hodgson* is also factually distinguishable because the food service company that operated the cafeteria advertised the cafeteria's services to the public at large.[4] *Id.* at 199.

4. Aramark lists additional reasons why *Hodgson* is inapposite, but we do not address them here because they are factually inaccurate. For example, Aramark erroneously states that the food

¶ 31 On the other hand, Golden argues that the transactions are retail sales because:

- *A.B. Hirschfeld Press* and *Martin Marietta* hold that, under the primary purpose test, a wholesale sale occurs if the purchaser's primary purpose in acquiring the item was to resell it in an unaltered and basically unused condition. *Id.* at 920–21. Here, the realities of the transactions—as opposed to the language used in the contract—demonstrate that CSM does not purchase the food from Aramark and resell it to consumers. Rather, the consumers acquire the food directly from Aramark for their own use and consumption. Aramark buys, prepares, displays, and serves the food. Aramark staffs the CSM food service facilities, pays the employees, operates the registers, and manages the facilities. No CSM representative ever handles or takes possession of the food either before or after it reaches the facilities. In the context of the food transactions, CSM is merely a collections agent or landlord, and not a wholesaler. *Cf. Hodgson*, 472 F.2d at 204.

- In *Frank Lyon Co. v. United States*, 435 U.S. 561, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978), the Supreme Court stated:

  "[T]axation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid." In a number of cases, the Court has refused to permit the transfer of formal legal title to shift the incidence of taxation attributable to ownership of property where the transferor continues to retain significant control over the property transferred. In applying this doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed. The Court has never regarded "the simple expedient of drawing up papers," as controlling for tax purposes when the objective economic realities are

  to the contrary. "In the field of taxation, administrators of the laws and the courts are concerned with substance and realities, and formal written documents are not rigidly binding." Nor is the parties' desire to achieve a particular tax result necessarily relevant.

  *Id.* at 572–73, 98 S.Ct. 1291 (citations omitted; quoting in part *Corliss v. Bowers*, 281 U.S. 376, 378, 50 S.Ct. 336, 74 L.Ed. 916 (1930); *C.I.R. v. Tower*, 327 U.S. 280, 291, 66 S.Ct. 532, 90 L.Ed. 670 (1946); *Helvering v. F. & R. Lazarus & Co.*, 308 U.S. 252, 255, 60 S.Ct. 209, 84 L.Ed. 226 (1939)). Here, the FSMA states that Aramark will provide food for CSM to resell. However, consistent with the language quoted from *Frank Lyon*, the objective economic realities indicate that, as discussed, Aramark sold the food directly to the CSM students, faculty, staff, and guests as retail sales, and not to CSM as wholesale sales.

- *Hodgson* held that a food service company that operated a college's cafeteria and snack bar was engaging in retail sales. *Hodgson*, 472 F.2d at 205. Although the retail sales question was part of the larger question of whether overtime and minimum wage provisions of the Fair Labor Standards Act applied, there is no reason why the retail analysis would differ in a tax case, like here. Indeed, the *Hodgson* facts are nearly identical to the facts here.

¶ 32 We conclude that both parties have presented several tenable arguments, namely:

¶ 33 Aramark's arguments that

(a) its transactions were quintessential wholesale sales under the primary use test of *A.B. Hirschfeld Press* and *Martin Marietta*;

(b) CSM's physical control over the food is not a requirement for a wholesale sale; and

(c) *Hodgson* is distinguishable because the food service company that operated the

service company in *Hodgson* "sold meal plans directly to students," that the college in *Hodgson* did not provide passive programming, that "the college in *Hodgson* was required to obtain [the food service company's] permission before using

the dining facilities—i.e., [the food service company] controlled the facilities," and that the Department of Revenue opinion in this case held that *Hodgson* was inapplicable here.

cafeteria in *Hodgson* advertised the cafeteria's services to the public at large; as well as

¶ 34 Golden's arguments that

(a) the realities of the transactions—as opposed to the language used in the contract—demonstrate that CSM acts only as Aramark's collections agent or landlord in Aramark's retail sales to the CSM consumers; and

(b) although *Hodgson* was a labor case, the facts were nearly identical to this case, and there is no reason why a different analysis should apply in a tax case.

¶ 35 However, we need not further weigh the comparative merits of these arguments to decide whose position is stronger because we must construe the exemption narrowly, and if the arguments leave us with any reasonable doubts that Aramark is entitled to the wholesale sales exemption, then we must resolve the doubts against the exemption. *See Catholic Health Initiatives Colorado*, 207 P.3d at 818.

¶ 36 Here, after thoroughly considering the parties' arguments, we conclude that Golden's arguments are sufficiently tenable as to create reasonable doubts that Aramark is entitled to the wholesale sales exemption.[5] Accordingly, we resolve our reasonable doubts against the exemption and conclude that Aramark is not entitled to receive the wholesale sales exemption set forth in GMC section 3.03.040(a)(13). *See id.*

## IV. Exemption for Direct Sales to CSM in Its "Governmental Capacit[y] Only"

¶ 37 The GMC exempts from its sales tax

(7) All direct sales to the United States government, the State of Colorado, its departments or institutions, and the political subdivisions thereof in their governmental capacities only, when billed to and paid for by the governmental entity.

GMC § 3.03.040(7).

¶ 38 Golden contends that the district court erred in concluding that Aramark was ex-

empt from Golden's sales tax under the GMC's "governmental capacit[y]" exemption, GMC § 3.03.040(7). Aramark counters that the district court was correct for two reasons. First, Aramark asserts that it sold the food to CSM in CSM's governmental capacity of renting, leasing, maintaining, operating, and purchasing buildings and facilities for dining, as set forth in section 23–41–104, C.R.S.2012. Second, Aramark asserts that it sold the food to CSM in CSM's governmental capacity of educating its students. We address each of Aramark's arguments in turn and conclude that Aramark is not entitled to the governmental capacity exemption.

### A. Direct Sales

¶ 39 As an initial matter, a sale can only qualify for the governmental capacity exemption under GMC section 3.03.040(7) if it is a "direct sale[ ]" to a department or institution of the State of Colorado. CSM is an institution of the State of Colorado. *See* §§ 23–41–101 to –123, C.R.S.2012. However, it is less clear whether Aramark directly sells its food to CSM. Indeed, the direct sales question is closely related to the wholesale versus retail sales question. Nevertheless, we need not resolve whether Aramark's food sales are direct sales to CSM because we conclude that, even if they are, they still do not qualify for the governmental capacity exemption because, as explained below, they were not made to CSM in its "governmental capacit[y] only," as GMC section 3.03.040(7) requires.

### B. Statutory Power to Rent, Lease, Maintain, Operate, and Purchase Buildings and Facilities for Dining

¶ 40 Section 23–41–104(4), C.R.S.2012, provides:

The [CSM] board of trustees has the power to lease portions of the college grounds to private persons and corporations for the construction of research and development facilities, health and recreation facilities, dormitories, and living, dining, or group housing buildings and facilities and to rent,

---

**5.** We did not consider Aramark's argument that, because the FSMA is a requirements contract, it is entitled to the wholesale sales exemption. Ar-

amark did not assert, or provide authority for the proposition, that all requirements contracts are necessarily wholesale contracts.

lease, maintain, operate, and purchase such buildings and facilities.

Thus, as relevant here, CSM has the power to rent, lease, maintain, operate, and purchase buildings and facilities for dining. *See id.* Accordingly, we must decide whether Aramark sells food to CSM in CSM's governmental capacity of renting, leasing, maintaining, operating, or purchasing buildings and facilities for dining. Construing the governmental capacity exemption narrowly and resolving any reasonable doubts against the exemption, as we must do, we conclude that Aramark does not. *Catholic Health Initiatives Colorado*, 207 P.3d at 817–18; *Noble Energy, Inc.*, 232 P.3d at 296.

¶ 41 Nothing in the record suggests that CSM purchases food in order to rent, lease, or purchase buildings or facilities for dining. Indeed, food purchases would seem irrelevant for such endeavors. Moreover, the record makes clear that Aramark—not CSM—operates the dining facilities, so CSM therefore cannot purchase food from Aramark for *CSM's* operation of the dining facilities. Finally, although CSM may, in part, maintain the dining facilities, there is nothing in the record to suggest that CSM purchases the food as part of its maintenance of the buildings and facilities for dining. Again, food purchases would seem irrelevant for such a purpose.

¶ 42 Accordingly, we conclude that Aramark is not entitled to the governmental capacity exemption on this basis.

### C. Educational Process

¶ 43 Again, we assume without deciding that Aramark makes direct sales to CSM. We also assume without deciding that Aramark makes the food sales to CSM in CSM's governmental capacity of educating its students. *Cf. City of Boulder v. Regents of University of Colorado*, 179 Colo. 420, 425–26, 501 P.2d 123, 126 (1972) ("When academic departments of the University, or others acting under the auspices of the University, sponsor lectures, dissertations, art exhibitions, concerts and dramatic performances, whether or not an admission fee is charged, these functions become a part of the educational process. This educational process is not merely for the enrolled students of the University, but it is a part of the [ed]ucational process for those members of the public attending the events."). Nevertheless, as explained below, we conclude that Aramark's sales are not entitled to the governmental capacity exemption because they are not made to CSM in CSM's "governmental capacit[y] *only*." GMC § 3.03.04(7) (emphasis added). Rather, the sales are made to CSM in its proprietary capacity, as well. *See City of Aurora*, 32 P.3d at 591–93.

¶ 44 In *City of Aurora*, a division of this court considered whether Aurora was required to pay state use tax when it rented golf carts at one of its municipal golf courses. *Id.* at 591. The state exempts from its use tax "[t]he storage, use, consumption, or loan of tangible personal property by or to ... the state of Colorado ... or its ... political subdivisions *in their governmental capacities only*." § 39–26–713(2)(d), C.R.S.2012 (formerly codified at § 39–26–203(1)(e)) (emphasis added); *City of Aurora*, 32 P.3d at 591. The division noted the distinction between government actions in a public, legislative, or governmental capacity—in which a sovereign governs its people—and actions in a quasi-private, proprietary capacity—in which it acts for the private advantage of its residents and for itself as a legal entity. *City of Aurora*, 32 P.3d at 591–92. The division then held that Aurora was acting in its proprietary, not governmental, capacity when it rented golf carts because:

> Notwithstanding the fact that [the Aurora golf course's] golf carts are available to the general public, the provision of golf cart rentals, even if implicitly authorized by statutory provisions on municipal recreation facilities, is not a power conferred upon a municipality for the purpose of governing its people. Rather, Aurora's provision of golf cart rentals impresses us as being an exercise of its quasi-private power to act for the advantage, though not the exclusive advantage, of its inhabitants.

*Id.* at 592.

¶ 45 Moreover, the supreme court has discussed a municipality's proprietary capacity

in observing that "when a city undertakes to supply water outside its boundaries, it is acting in a proprietary capacity." *City & County of Denver v. Colo. River Water Conservation Dist.*, 696 P.2d 730, 742 (Colo.1985). The supreme court has also used the proprietary description "to distinguish a contractual service, in circumstances where a city is under no duty to serve yet decides to do so, from in-city service which is owed to consumers because of their resident status." *Bennett Bear Creek Farm Water & Sanitation Dist. v. City & County of Denver*, 928 P.2d 1254, 1266 (Colo.1996) (discussing *Colo. Open Space Council, Inc. v. City & County of Denver*, 190 Colo. 122, 123–25, 543 P.2d 1258, 1259 (1975)).

¶ 46 These cases indicate that when a governmental entity undertakes actions that it is not obligated to undertake as part of its public or governmental capacity, but rather undertakes them for the private advantage of its residents and itself as a legal entity, then it is acting in a proprietary capacity. *See Bennett Bear Creek Farm Water & Sanitation Dist.*, 928 P.2d at 1266; *Colo. River Water Conservation Dist.*, 696 P.2d at 742; *City of Aurora*, 32 P.3d at 591–92.

¶ 47 Here, we conclude that CSM was purchasing food not only in its governmental capacity of educating students, but also in its proprietary capacity. CSM's Vice President of Student Affairs and Dean of Students stated that CSM also requires students to buy residential meal plans "from a business standpoint" because it keeps costs stable and affordable. He also stated that CSM's food service facilities exist not only for the students, but as a convenience for those who work at CSM. Furthermore, CSM collects more from its students for their meal plans than it pays Aramark. The FSMA also provided that Aramark would pay CSM a 5% commission on receipts at some facilities and a 10% commission on receipts at others. These facts indicate that CSM purchased food, not only in its governmental capacity of educating students, but also for the private advantage of the faculty and for itself as a

legal entity. *See City of Aurora*, 32 P.3d at 591–92.

¶ 48 Thus, construing the governmental capacity exemption narrowly and resolving any reasonable doubts against the exemption, as we must, we conclude that Aramark sells food to CSM in both its governmental and proprietary capacities. *See Catholic Health Initiatives Colorado*, 207 P.3d at 817–18; *Noble Energy, Inc.*, 232 P.3d at 296; *City of Aurora*, 32 P.3d at 591–92. Accordingly, Aramark's food sales do not qualify for the sales tax exemption for direct sales to a state institution in its "governmental capacit[y] only." GMC § 3.03.040(a)(7) (emphasis added).

¶ 49 In summary, we conclude that in providing food on CSM's campus pursuant to the FSMA, Aramark is not entitled to exemption from Golden's sales tax under either the GMC's "wholesale sales" or "governmental capacit[y]" exemptions, GMC sections 3.03.040(a)(7), (13).

¶ 50 The summary judgment is reversed, and the case is remanded to the district court with directions to reinstate the tax assessment.

FURMAN and PLANK *, JJ., concur.