Opinion by JUDGE BERNARD
¶ 1 This appeal involves a municipal tax on the use, storage, or consumption of personal property. We must decide, under the facts here, whether the scrap generated during the use of aluminum sheets by a manufacturer is purchased
?at wholesale, and therefore exempt from the use tax; or
?at retail, and therefore taxable under the use tax.
One important fact that governs our analysis is that, when the aluminum is purchased, the manufacturer intends to resell the scrap generated by the manufacturing process, and then does so.
¶ 2 To resolve this issue, we apply the "primary purpose" test, which was announced in A.B. Hirschfeld Press, Inc. v. City & County of Denver, 806 P.2d 917, 918-26 (Colo.1991). As a result, we conclude that the record supports the trial court's determinations that (1) the aluminum sheets were purchased with the purpose and understanding that the scrap generated by the manufacturing process would be resold; and (2) the purchases of the aluminum that became scrap were wholesale and exempt from the use tax. We affirm the trial court's grant of summary judgment on that issue.
¶ 3 We are also called upon to decide whether a district court has authority to toll the accruing of post judgment interest when a judgment debtor satisfies a judgment by depositing funds in the court's registry after it has filed a notice of appeal. To decide this issue, we first conclude that the trial court had jurisdiction to accept the deposit of funds into the court's registry from the judgment debtor. Then, we further conclude that the trial court's decision to toll the accruing of post judgment interest once the money was deposited in the registry (1) was not prohibited by the language of the post judgment interest statute; and (2) was consistent with the purposes of that statute.
¶ 4 As a result of these conclusions, we affirm the trial court's decisions
?to grant summary judgment in favor of the manufacturer, plaintiffs, Coors Brewing Company, Rocky Mountain Metal Container, LLC, and MillerCoors, LLC; and
?to toll the accruing of post judgment interest on money that the judgment debtor, defendant, the City of Golden, deposited in the registry of the court after the trial court entered summary judgment in favor of the manufacturer.
*770 I. Background
¶ 5 The manufacturer owns and operates a factory in the City of Golden that makes the ends and tabs of beer cans. To make these ends and tabs, the manufacturer purchases rolled sheets of aluminum in large coils. In a method analogous to a baker using a cookie-cutter, a machine punches the ends and tabs out of the sheets. But, like a baker using a cookie-cutter, not all of the aluminum is used in this process. Approximately twenty percent of the aluminum is scrap because it remains on the sheet after the ends and tabs are punched out.
¶ 6 The manufacturer then follows a process to collect this scrap for resale. First, the sheets are cut into smaller pieces. Then, large vacuums collect these pieces. They are delivered to machines that compress them into square, forty-pound briquettes. These briquettes are then stacked together and sold to aluminum companies.
¶ 7 The city issued a use tax assessment for the scrap, asserting that the scrap that was resold was "used" by the manufacturer in its manufacturing process. The city did not assess tax on the parts of the aluminum sheets that were incorporated into the ends and tabs.
¶ 8 The assessment covered the period between 1999 and 2008, and the city claimed that it was owed roughly $5 million. The manufacturer objected, and the city held an informal hearing. After this hearing, the city's finance director upheld the assessment and ordered the manufacturer to pay about $5.3 million, an amount that included interest.
¶ 9 In order to stop interest from accruing, the manufacturer paid the city the full amount under protest. See § 39-21-105(4)(b), C.R.S.2012. The manufacturer also filed an action in the district court challenging the assessment and requesting a trial de novo. § 39-21-105(2)(b), C.R.S.2012.
¶ 10 The city and the manufacturer agreed that there were no issues of material fact, and they both filed motions for summary judgment. The trial court concluded that the manufacturer's primary purpose in purchasing the parts of the aluminum sheets that became scrap in the course of the manufacturing process was to resell them. Therefore, the trial court held that the purchases of the parts of the aluminum sheets that became scrap were wholesale and exempt from the use tax. The court then entered judgment in favor of the manufacturer, and ordered the city to repay the manufacturer the amount that it had assessed under the use tax on the scrap, plus six percent interest.
¶ 11 It was the city's turn to seek to avoid interest from accruing. Clearly reserving its right to appeal the trial court's summary judgment order, the city tendered a check for over $5.5 million to the manufacturer. This amount consisted of the judgment and all interest that had accrued up to that point.
¶ 12 The manufacturer refused to accept the city's check. The city then filed a motion that (1) requested the trial court's permission, under C.R.C.P. 67(a), to deposit the entire amount of the check in the registry of the court; and (2) asked the court to toll the accruing of the post judgment six percent interest. The trial court granted both parts of this motion. It is our understanding that this money remains in the court's registry, and that the manufacturer may withdraw it at any time.
¶ 13 Both parties filed notices of appeal. The city appealed, arguing that the trial court should not have granted summary judgment because the manufacturer "used" the scrap. Therefore, the city argued, the scrap should be subject to the use tax.
¶ 14 The manufacturer initially filed an appeal that contended that the trial court had chosen the wrong interest rate for the judgment. It then added a cross-appeal after the court granted the city's C.R.C.P. 67(a) motion. The manufacturer has abandoned the first issue, and it now alleges only that (1) the decision to grant the C.R.C.P. 67(a) motion is void; and (2) the trial court erred when it ordered that the city's deposit of the check in the registry of the court tolled post judgment interest from accruing on the judgment.
*771 II. The Scrap Aluminum Purchases Are Wholesale and Not Taxable
¶ 15 We begin by recognizing that the use tax does not apply to the parts of the aluminum sheets that are incorporated into the ends and tabs for beer cans. This incorporated aluminum falls under an exemption to the use tax-the "processing clause"-that is not at issue here. The only issue we are called upon to decide is whether the use tax applies to the scrap.
A. Standard of Review
¶ 16 We review de novo both a district court's grant of summary judgment and its interpretation of a municipal code. City of Golden v. Aramark Educational Services, LLC , 2013 COA 45, ¶10, 310 P.3d 609, 2013 WL 1240891 (citing BallAerospace & Techs. Corp. v. City of Boulder, 2012 COA 153, ¶8, 304 P.3d 262, 2012 WL 4021425 ).
¶ 17 Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ball Aerospace, ¶ 8. Here, the manufacturer and the city agreed in the trial court that there were no disputed issues of material fact.
¶ 18 Generally, when interpreting tax provisions-including the municipal provision here-we resolve doubts in favor of the taxpayer. Aramark, ¶ 11 (citing Noble Energy, Inc. v. Colo. Dep't of Revenue, 232 P.3d 293, 296 (Colo.App.2010) ). "However, this presumption is reversed when the taxpayer claims a statutory exemption from taxation." Id. We presume that taxation is the rule, resolving any reasonable doubts against the exemption. Id. at ¶ 12 (citing Catholic Health Initiatives Colo. v. City of Pueblo, 207 P.3d 812, 818 (Colo.2009) ).
B. "Retail" and "Wholesale" Transactions
1. The Municipal Code
¶ 19 As a general rule, the city's municipal code (GMC) levies a use tax on all purchases of tangible personal property for which the payment of the municipal sales tax is not required. GMC § 3.03.030(b)(1). However, the city exempts "all wholesale sales." GMC §§ 3.03.040(a)(13), 3.03.050(a)(1). The municipal code defines wholesale sales as
[s]ales to licensed retailers, jobbers, dealers[,] or wholesalers for resale. Sales by wholesalers to consumers are not wholesale sales. Sales by wholesalers to non-licensed retailers are not wholesale sales.
GMC § 3.02.010.
¶ 20 The city's municipal code also exempts tangible personal property from the use tax when it is incorporated into a manufactured product. This exemption, which is called the "processing clause," states:
Sales of tangible personal property to a person engaged in the business of manufacturing, compounding for sale, profit or use, any article, substance or commodity:
(A) Which tangible personal property is actually and factually transformed by the process of manufacturing or compounding; and
(B) Which tangible personal property becomes by the manufacturing or compounding process, a necessary and recognizable ingredient, component and constituent part of the finished product; and
(C) Whose physical presence in the finished product is essential to the use thereof in the hands of the ultimate consumer.
G.M.C. § 3.03.040(a)(14).
2. The Primary Purpose Test
¶ 21 To determine whether a transaction is retail or wholesale, our supreme court has formulated the "primary purpose" test. A.B. Hirschfeld, 806 P.2d at 918-26. Applying use tax provisions in Denver's code that are nearly identical to the ones at issue here, the court in A.B. Hirschfeld stated that a wholesale purchase occurs "if the primary purpose of the transaction is the acquisition of the item for resale in an unaltered condition and basically unused by the purchaser." Id. at 921.
¶ 22 Although subjective intent is relevant, the primary purpose test is objective in nature. Id. The court must consider five factors in the course of this analysis.
*772 1. "[T]he actual conduct of a purchaser subsequent to a disputed purchase." Id.
2. "[T]he nature of the purchaser's contractual obligations, if any, to use, alter[,] or consume the property to produce goods or services." Id.
3. "[T]he degree to which the items in question are essential to the purchaser's performance of those obligations." Id.
4. "[T]he degree to which the purchaser controls the manner in which the items are used, altered[,] or consumed prior to their transfer to third parties." Id.
5. "[T]he degree to which the form, character[,] or composition of the items when transferred to third parties differ[ ] from the form, character[,] or composition of those items at the time they were initially purchased." Id . (emphasis supplied).
¶ 23 Finally, after considering these factors, if a court determines that a purchaser acquired the property "primarily for resale to another," then the use tax would not apply to the property "even if the purchaser were to make minor use of the item." Id . (emphasis supplied); see also Reg'l Transp. Dist. v. Martin Marietta Corp ., 805 P.2d 1102, 1104 (Colo.1991) (rejecting a test that would tax a reseller if it "use[d] the item in any fashion").
¶ 24 Both A.B. Hirschfeld and Martin Marietta relied on two out-of-state cases as examples of jurisdictions that employ the "primary purpose" test: Kaiser Steel Corp. v. State Board of Equalization, 24 Cal.3d 188, 154 Cal.Rptr. 919, 593 P.2d 864 (1979) ; and Baltimore Foundry & Machine Corp. v. Comptroller of State, 211 Md. 316, 127 A.2d 368 (1956). See A.B. Hirschfeld, 806 P.2d at 921 ; Martin Marietta, 805 P.2d at 1105.
¶ 25 Both of those cases include analysis that is relevant to our analysis here. In Kaiser Steel, the California Supreme Court recognized that the state board of equalization had apportioned its use tax "according to uses made of the materials purchased," "if the purchaser can establish what portion he is using for the exempt purpose and what portion for the nonexempt purpose," "even though the portions will be utilized at the same time." Kaiser Steel, 24 Cal.3d at 196, 154 Cal.Rptr. 919, 593 P.2d at 869.
¶ 26 The California Supreme Court cited several examples of this concept, including one in which the board of equalization apportioned taxes on the purchase of coke to be used in the steel industry "in terms of proportions utilized for the dual purposes of aid in manufacture and for resale." Id. at 197, 154 Cal.Rptr. 919, 593 P.2d at 869.
¶ 27 However, the court also observed that "[a]pportionment has no place [when the purchaser] ... did not have dual purposes for the quantities purchased." Id . As a result, the court held that, under the facts of that case, the purchaser did not have dual purposes for the materials that it had bought, and, therefore, it was not entitled to a tax exemption for the materials that it resold.
¶ 28 In Baltimore Foundry, a foundry bought wooden "patterns" from a supplier, and it used the patterns to make casts to shape hot metal. 211 Md. at 318, 127 A.2d at 368-69. At the completion of the project, the foundry either sold the patterns to the customer or stored the patterns to be used for that customer's future orders. Id.
¶ 29 The customer knew, at the beginning of the project, that, when the project was completed, it would buy the patterns or ask the foundry to store them. Id. at 318, 127 A.2d at 369. Thus, when the foundry ordered the patterns, it "had a definite purpose and commitment to resell them to its customers," "[b]ut it also had a purpose to use the patterns for the manufacture of the finished products." Id. at 320, 127 A.2d at 369. In other words, the foundry "had a joint or dual purpose in buying patterns, for resale at a profit and to enable it to make the [metal] castings which it [sold] at a profit." Id . at 319, 127 A.2d at 369. And, although the patterns were used in the production process, they were not incorporated into the metal casings, which were the finished product of the manufacturing process.
¶ 30 The Maryland Court of Appeals concluded that the foundry's purchases of the patterns were not retail sales under a Maryland *773 statute because the patterns were purchased for resale.
[T]he resales were profitable and real, and were in all cases contracted for prior to beginning ... production.... The purpose to resell was manifested and a resale price quoted in every instance contemporaneous with the placing of the order for the patterns.
Id. at 322, 127 A.2d at 370-71.
C. Discussion
¶ 31 Based on the record before us, and after applying the law that we have described above, we conclude that, at the time the aluminum sheets are purchased, the manufacturer (1) knows that the manufacturing process will create the scrap; (2) intends to resell the scrap; and, as a result, (3) its primary purpose in buying the parts of the aluminum that will become scrap is to resell it. In reaching these conclusions, we construe the wholesale exemption to the use tax narrowly, and we construe all reasonable doubts against the manufacturer. See Aramark, ¶ 12. We support our conclusion with the following analysis.
1. Colorado Case Law
¶ 32 As indicated above, the question we must answer to resolve this issue is "whether the primary purpose of the purchase was the acquisition of the item for resale in an unaltered condition and basically unused by the purchaser." Conoco, Inc. v. Tinklenberg, 121P.3d 893, 896 (Colo.App.2005). To assist us in answering this question, we look to Colorado appellate decisions that have, in analogous circumstances, analyzed a company's use of tangible personal property. From those cases, we distill several helpful analytical concepts.
¶ 33First, "the terms 'wholesale' and 'retail' do not in the use tax context bear exactly the same meaning as they do when used in their normal commercial context." Int'l Bus. Machs. Corp. v. Charnes, 198 Colo. 374, 378, 601 P.2d 622, 625 (1979) ( IBM ) (citing Carpenter v. Carman Distrib. Co., 111 Colo. 566, 575, 144 P.2d 770, 774 (1943) ). Rather, our supreme court has held that, when analyzing these two words in a state use tax statute that is similar to the one we discuss here, "[i]t seems certain from [the use of these words] that the statute was fundamentally intended to impose a tax upon that which is consumed and used and exempts only that which is sold for resale." Bedford v. Colorado Fuel & Iron Corp., 102 Colo. 538, 543, 81 P.2d 752, 754-55 (1938).
¶ 34 Second, "[t]he use to which the purchaser puts the property will often define the true nature of a particular transaction." Martin Marietta, 805 P.2d at 1105.
¶ 35Third, in the context of analyzing exemptions from the use tax under a processing clause, items or materials that are incorporated into a company's product and then sold to a consumer are not purchased for resale. One factor to consider when deciding whether materials are consumed and used in the manufacturing process is whether they "become a constituent part [of the manufactured product] wholly or partially, by either chemical or mechanical means." Bedford, 102 Colo. at 549, 81 P.2d at 757. In evaluating this factor, we recognize "the distinction between the process itself and the intervening agencies used in applying the process to the finished product." Id . In the course of processing, "to be tax exempt [from use tax under a processing clause] tangible personal property must actually and factually enter into the subject matter transformed in the process, as in manufacturing proper it is required to become a constituent of the product." Id . at 550, 81 P.2d at 757 ; see also C.F. & I. Steel Corp. v. Charnes , 637 P.2d 324, 328 (Colo.1981) ("in order to be exempt [from use tax] ... tangible personal property purchased by a manufacturer must become a constituent part of the finished product, wholly or partially, by either chemical or mechanical means").
¶ 36 Other cases provide examples of this concept. For example, in Craftsman Painters & Decorators v. Carpenter, 111 Colo. 1, 5-6, 137 P.2d 414, 416 (1942), the court held that contractors who bought items such as paint, wire, and lighting fixtures, which they entirely incorporated into structures that were sold to owners, did not buy those items for resale.
*774 ¶ 37 In A.B. Hirschfeld, the "pre-press" materials in question-including film, negatives, photographs, and transparencies-were "usable only for a particular order"; became the customer's property when the final product was delivered to the customer; or were retained by the company "to print reruns of a final product." A.B. Hirschfeld, 806 P.2d at 919. As a result, the company in A.B. Hirschfeld "substantially used and often altered the pre-press materials in performing its contractual obligations to its customers." Id. at 924.
¶ 38 And in Singleton Sheet Metal Works, Inc. v. Martin, 680 P.2d 1288, 1290 (Colo.App.1983), raw materials that were used to manufacture products were exempt from taxation under a municipal use tax because they were processed and "became a constituent part of the manufactured product by mechanical means."
¶ 39 Fourth, if a purchaser permanently diverts materials or items to its own use, the purchase of the materials or items is subject to use tax because it is a retail purchase. For example, in IBM, a company that manufactured and sold business equipment permanently diverted some materials and component parts to its own use.
[A]lthough IBM's original purchases of parts and materials appeared to be wholesale, and thus exempt from sales tax at the time of purchase, the wholesale transactions were transformed into retail ones upon the company's ultimate election to dispose of the items purchased by using or consuming them in its own business operations rather than reselling them.
IBM, 198 Colo. at 378, 601 P.2d at 625 (emphasis supplied); see also Western Paving Constr. Co. v. Beer , 917 P.2d 344, 348 (Colo.App.1996) ("When a manufacturer of tangible personal property uses or consumes items of tangible personal property manufactured by it that it also sells or installs for a price in the ordinary course of its business at retail, a taxable event has occurred within the ambit of [Denver's use tax].").
¶ 40 And, in Conoco, 121 P.3d at 896, a refinery purchased crude oil that it processed into various petroleum products, including motor fuels and asphalt. Id . at 895. One of the by-products was waste gas, which was not marketable and which could have been flared off. Id. The refinery instead combined the waste gas with natural gas that it purchased, and it used the combination to heat its refining process and administrative offices. Id. The division in Conoco concluded that the "intentional, purposeful use and the failure to resell the waste gas ... transform[ed] the waste gas portion of the crude oil wholesale sale into a retail sale." Id. at 897 (emphasis supplied).
¶ 41 Fifth, a company's temporary diversion of raw materials from the production stream, before returning them to the product that the company makes, is not treated the same as a company's permanent diversion of materials or items to its own use. In C.F. & I. Steel , a foundry used raw materials to make items, such as molds, that it used in manufacturing steel. 637 P.2d at 326. Once these items were no longer useful, they were melted down and "returned to the normal steel production process as scrap metal." Id. at 330. The supreme court held that a use tax was not applicable to these items when the foundry made them because such "brief utilization" was not a taxable event. Id.
¶ 42 Keeping these concepts in mind, we next analyze the undisputed facts of this case under the A.B. Hirschfeld primary purpose test.
2. Analysis
a. The Actual Conduct of the Manufacturer After the Aluminum is Purchased
¶ 43 Here, the facts establish that, after the manufacturer purchases the aluminum sheets, most of the sheets are incorporated into beer can ends and tabs. But a known and significant amount-twenty percent-will always be left over as scrap that does not become part of the manufactured product. The manufacturer collects the scrap, compresses it into briquettes, and resells it. And the manufacturer knows that it will produce, collect, and resell the scrap before the aluminum sheets are purchased.
*775 b. The Nature of the Manufacturer's Contractual Obligations to Use, Alter, or Consume the Scrap to Manufacture Beer Can Ends and Tabs
¶ 44 Although the manufacturer is contracted to manufacture beer can ends and tabs, it is not obligated to incorporate the scrap into those ends and tabs. Rather, it is free to resell the scrap.
¶ 45 "The use to which the purchaser puts the property will often define the true nature of a particular transaction." Martin Marietta, 805 P.2d at 1105. Here, from the beginning of the manufacturing process, the manufacturer is aware that the aluminum sheets will be put to two uses: most will be incorporated into the product; and the rest will be resold as scrap.
¶ 46 As we recognize above, our supreme court cited two out-of-state opinions in A.B. Hirschfeld and Martin Marietta as examples of jurisdictions that employ a primary purpose test. The courts in each of those cases analyzed a situation similar to the one we face in this case. The scrap here is analogous to the coke in Kaiser Steel and the patterns in Baltimore Foundry because (1) the manufacturer had "dual purposes" for the aluminum sheets when they were purchased, and it could establish the portion of the aluminum that it was using for the purpose of incorporating into its product and the portion it was using that would become scrap, see Kaiser Steel, 24 Cal.3d at 197, 154 Cal.Rptr. 919, 593 P.2d at 869 ; and (2) the "purpose to resell [the scrap] was manifested" when the aluminum sheets were purchased, see Baltimore Foundry, 211 Md. at 322, 127 A.2d at 370-71.
¶ 47 Our supreme court's citations to Kaiser Steel and Baltimore Foundry lead us to reject the city's argument that the primary purpose test focuses solely on the manufacturer's primary reason for purchasing materials, which here would be to manufacture beer can ends and tabs. Rather, as Kaiser Steel and Baltimore Foundry point out, the test has a broader scope. It recognizes that, in cases such as this one, when materials come in the door, their purchaser may have a primary purpose for the portion of the materials that is incorporated into a product, and another primary purpose for waste or excess materials that are created by the manufacturing process. In other words, initial purchases of materials can be part retail and part wholesale. See Conoco, 121 P.3d at 897 (citing Mobil Oil Corp. v. Johnson, 93 Ill.2d 126, 132, 66 Ill.Dec. 285, 442 N.E.2d 846, 851 (1982), for the proposition that "a sale is not an indivisible unit, but ... taxability will be determined by the uses to which the property is put").
¶ 48 Therefore, although the manufacturer makes minor use of the scrap, we conclude that these facts support the conclusion that the manufacturer acquires the scrap "primarily for resale to another." See A.B. Hirschfeld, 806 P.2d at 921.
c. The Degree to Which the Scrap Is Essential to the Manufacturer's Obligations to Manufacture Beer Can Ends and Tabs
¶ 49 As the city points out, the entire aluminum sheet is run through the manufacturing process. However, although the scrap serves as a skeleton that holds the aluminum used in the ends and tabs in place during that process, it does not become part of the finished product. Thus, we conclude that the scrap is not essential to the manufacturer's obligation to manufacture the ends and tabs because it is part of "the intervening agenc[y] used in applying the [manufacturing] process to the finished product." Bedford, 102 Colo. at 549, 81 P.2d at 757.
d. The Degree to Which the Manufacturer Controls the Manner in Which the Scrap is Used, Altered, or Consumed Before It Is Resold
¶ 50 Based on our understanding of the facts, we reach two conclusions about what the scrap in this case is not.
?The scrap is not incorporated, "by either chemical or mechanical means," Bedford, 102 Colo. at 549, 81 P.2d at 757, into the final product that the manufacturer produces. As a result, (1) the scrap is not included in the category of purchases that is subject to the city's "processing clause," see G.M.C. § 3.03.040(a)(14);
*776 and (2) the scrap is not included in one category of materials that cannot be purchased for resale. See A.B. Hirschfeld, 806 P.2d at 919 ; C.F. & I. Steel, 637 P.2d at 328 ; Craftsman, 111 Colo. at 5-6, 137 P.2d at 416 ; Bedford, 102 Colo. at 549, 81 P.2d at 757 ; Singleton, 680 P.2d at 1290 ; see also M. Patrick Wilson and Christopher Price, Local Government Sales and Use Taxes, 40 Colo. Law. 61, 61 (July 2011) ("Retail transactions ... generally consist of goods and services that are not going to be resold; instead, they are consumed or used by the purchaser.").
?The scrap is not permanently diverted to the manufacturer's own use. Therefore, it is not included in one category of retail purchases that is subject to use tax. See IBM, 198 Colo. at 379, 601 P.2d at 625 ; Conoco, 121 P.3d at 897 ; Western Paving, 917 P.2d at 348.
e. The Degree to Which the Manufacturer Alters the Form, Character, or Composition of the Scrap Before It Resells the Scrap
¶ 51 Contrary to the city's argument, the manufacturer's treatment of the scrap does not "alter" it sufficiently to subject it to the use tax. Relying on the authority in the preceding section, we conclude that the manufacturer did not alter the scrap, as that concept has been analyzed in cases such as A.B. Hirschfeld, because it did not consume the scrap itself or incorporate the scrap into the manufactured product. Rather, the process that collects the scrap and compresses it into briquettes is a change in packaging, not a change in "form, character[,] or composition. " A.B. Hirschfeld, 806 P.2d at 921 (emphasis supplied). As the trial court noted, "[s]imply put, [the manufacturer] purchased aluminum and ultimately resold aluminum."
¶ 52 Further, the use of the scrap here is like the "brief utilization" of the molds in C.F. & I . Once it serves its purpose as a skeleton, the manufacturer resells it rather than otherwise using it in the manufacturing process. Following the reasoning in C.F. & I. Steel, such fleeting usage in the manufacturing process is not a "taxable event." C.F. & I. Steel, 637 P.2d at 330.
¶ 53A.B. Hirschfeld and Martin Marietta support this analysis. The purchaser in A.B. Hirschfeld bought pre-press materials that were customizable for a customer's order. A.B. Hirschfeld, 806 P.2d at 919. The printer altered these materials, which then became "usable only for a particular order and bec[ame] the property of the customer at the time the final product [wa]s delivered to the customer." Id. Because of this alteration and the materials' necessity to the printing process, the supreme court held that the printer "made substantial use of the pre-press materials for its own direct and indirect benefit." Id. at 923-24. Likewise, the taxpayer in Martin Marietta, a government contractor, purchased "special testing and tooling equipment" which was used solely in the performance of government contracts. Martin Marietta, 805 P.2d at 1103, 1105-06.
¶ 54 In contrast to the extensive use in A.B. Hirschfeld and Martin Marietta, the scrap here is only fleetingly useful in the manufacturing. It remains in place after the stamping process, and that process only serves to separate the ends and tabs from the scrap. Further, the manufacturer intends to sell the scrap when it purchases the aluminum sheets; it knows that it will sell the scrap when the aluminum sheets are delivered to its factory; and the scrap is, in fact, sold after it is created by the manufacturing process. See IBM, 198 Colo. at 378, 601 P.2d at 625 ("[I]t is clear that although IBM's original purchases of parts and materials appeared to be wholesale, and thus exempt from sales tax at the time of purchase, the wholesale transactions were transformed into retail ones upon the company's ultimate election to dispose of the items purchased by using or consuming them in its own business operations rather than reselling them. " (emphasis supplied)); Conoco, 121 P.3d at 896 (analyzing "the disposition of a purchased product by the buyer").
¶ 55 And, like the waste gas that the refinery in Conoco produced, the scrap aluminum here is a by-product of the manufacturing process. Presumably, the waste gas was less *777 valuable than the original crude oil. 121 P.3d at 895 ("Conoco presented testimony that no market exists for waste gas."). But the division in Conoco recognized that the waste gas might not have been taxable had it been resold. See id. at 897. Here, however, the scrap aluminum was resold. This key distinction, combined with the foregoing analysis of the limited extent of the manufacturer's use of the scrap, supports the trial court's conclusion that the purchases of the aluminum that became scrap were wholesale, not retail.
¶ 56 Last, we reject the city's argument that the aluminum is extensively used because the manufacturer sells the briquettes for only about ninety percent of the price-per-weight that it paid for the sheet aluminum. As we have noted above, the term "wholesale" here has a different meaning than when it is used in its normal commercial context. IBM, 198 Colo. at 378, 601 P.2d at 625. The core of this difference is that the price paid when the material is resold does not define the term. Rather, it is defined by the use to which the purchaser puts the material and by whether the material is resold. See Bedford, 102 Colo. at 543, 81 P.2d at 754-55 ("It seems certain from [the use of the words 'wholesale' and 'retail'] that the statute was fundamentally intended to impose a tax upon that which is consumed and used and exempts only that which is sold for resale."). As the supreme court pointed out in A.B. Hirschfeld,
[a] purchaser may buy in large quantities what is commercially known as at "wholesale" and get wholesale prices and still the sale may not be exempt. Exemption depends entirely upon the disposition of a purchased product by the buyer.
A.B. Hirschfeld , 806 P.2d at 923 (quoting Carpenter, 111 Colo. at 575, 144 P.2d at 773-74 ).
¶ 57 For these reasons, we conclude that the manufacturer's purchases of the parts of the aluminum sheets that became scrap were wholesale transactions for purposes of the city's use tax. Therefore, the trial court properly determined that the purchases were not taxable. Because we affirm the trial court's determination that these purchases were exempt as wholesale transactions, we need not consider whether they are exempt under the city's "processing clause."
III. The Trial Court Retained Jurisdiction to Enter the Deposit Order
¶ 58 On cross-appeal, the manufacturer contends that the trial court improperly granted the city's motion to deposit funds with the court registry and held that this deposit would toll the accruing of post judgment interest. We first consider whether the trial court had jurisdiction to grant the city's C.R.C.P. 67(a) request to deposit the funds in the court's registry, even though the parties had filed their notices of appeal when the motion was filed and the time for ruling on C.R.C.P. 59 motions had expired. We conclude that the trial court retained jurisdiction to enter the order allowing the city to deposit the funds in the court's registry, and, therefore, we reach the merits of the manufacturer's cross-appeal.
¶ 59 A challenge to a court's jurisdiction is an issue of law that we review de novo. See People v. Efferson, 122 P.3d 1038, 1040 (Colo.App.2005).
¶ 60 The filing of a notice of appeal is "generally an event of jurisdictional significance." Colo. State Bd. of Med. Examiners v. Lopez-Samayoa , 887 P.2d 8, 14 (Colo.1994). Once the notice is filed, the trial court is "divest[ed] ... of authority to consider matters of substance affecting directly the judgment appealed from." Molitor v. Anderson, 795 P.2d 266, 269 (Colo.1990).
¶ 61 But trial courts retain jurisdiction to "act on matters that are not relative to and do not affect the judgment on appeal." Musick v. Woznicki, 136 P.3d 244, 248 (Colo.2006) (quoting People v. Stewart, 55 P.3d 107, 126 (Colo.2002) ). As is pertinent here, trial courts may render orders to enforce judgments. See Schnier v. Dist. Court, 696 P.2d 264, 267 (Colo.1985) (holding that the trial court could consider a contempt motion to seek enforcement of a judgment); Lay v. Dist. Court, 171 Colo. 472, 472, 468 P.2d 375, 375 (1970) ("It is elemental that where a judgment is not stayed by proper order or bond, there is no impediment against proceedings *778 in the trial court for the purpose of executing on the judgment."). This is because "such collateral post judgment proceedings do not challenge the propriety of the judgment itself." Molitor, 795 P.2d at 268.
¶ 62 Here, in July 2012, two weeks after the trial court entered summary judgment in favor of the manufacturer and against the city, the city delivered a check to cover the judgment and accrued interest to the manufacturer's offices. The manufacturer rejected this payment, presumably because post judgment interest would continue to accrue. On the same day, the city filed its motion under C.R.C.P. 67(a) to deposit the funds in the court registry and to toll the accruing of post judgment interest. This motion expressly disclaimed that it was attempting to amend the judgment pursuant to C.R.C.P. 59. It stated:
As an initial matter, the [c]ity does not believe that this [m]otion falls under the scope of Rule 59 motions for post-trial relief. However, because today is the final day for filing Rule 59 motions, the [c]ity is filing the [m]otion (before [the manufacturer has] officially rejected the formal [t]endered [p]ayment) out of an abundance of caution.
¶ 63 The trial court granted this motion months later, in October 2012. By that point, the city had filed its notice of appeal. Also, the timeline for ruling on C.R.C.P. 59 motions had lapsed. See C. R.C.P. 59(j) ("The court shall determine any post-trial motion within 63 days (9 weeks) of the date of the filing of the motion.... Any post-trial motion that has not been decided within the 63-day determination period shall, without further action by the court, be deemed denied for all purposes including Rule 4(a) of the Colorado Appellate Rules and time for appeal shall commence as of that date.").
¶ 64 The manufacturer contends that the deposit order was void, because (1) the city had already filed its notice of appeal, and so the trial court lacked jurisdiction to grant the city's motion; and (2) the order was deemed denied under C.R.C.P. 59(j). We disagree with both contentions.
¶ 65 First, the motion to deposit funds with the court registry most closely resembled an enforcement proceeding and, therefore, we conclude that the trial court retained jurisdiction to consider it. See Schnier , 696 P.2d at 267 ; Lay , 171 Colo. at 472, 468 P.2d at 375. The city's motion to deposit funds in the court registry did not "challenge the propriety of the judgment itself." Molitor , 795 P.2d at 268. In fact, it achieved the opposite result, satisfying the judgment and complying with the trial court's summary judgment order. Absent a stay, the trial court could have entertained the manufacturer's motion for enforcement of the judgment even after the filing of a notice of appeal. See Molitor , 795 P.2d at 268 ; Lay , 171 Colo. at 472, 468 P.2d at 375. Like a motion for enforcement, the city's motion merely sought to satisfy the judgment pending the result of this appeal.
¶ 66 Second, the manufacturer asserts that we must construe the motion to deposit funds as a motion pursuant to C.R.C.P. 59. "Actions taken under C.R.C.P. 59 after the [63]-day period are outside the court's jurisdiction and are void." De Avila v. Estate of DeHerrera, 75 P.3d 1144, 1146 (Colo.App.2003) (emphasis supplied)(citing Driscoll v. Dist. Court, 870 P.2d 1250, 1252 (Colo.1994) ). For many of the same reasons we determined that this order was collateral to the judgment, we also conclude that it was not a post-trial motion pursuant to C.R.C.P. 59.
¶ 67 C.R.C.P. 59 refers expressly to four types of relief sought by parties in post-trial motions:
(1) A new trial of all or part of the issues;
(2) Judgment notwithstanding the verdict;
(3) Amendment of findings; or
(4) Amendment of judgment.
C.R.C.P. 59(a).
¶ 68 In its motion, the city expressly disclaimed any reliance on C.R.C.P. 59. And the motion itself does not seek any of the relief provided in C.R.C.P. 59(a). As discussed above, the motion to deposit funds did not seek to amend the trial court's findings or judgment, and it did not ask for a new trial or judgment notwithstanding the verdict.
*779 ¶ 69 We also reject the manufacturer's contention that the order called the judgment into question or that it amended the judgment because it tolled the accruing of interest. The manufacturer cites Weize Co. v. Colorado Regional Construction, Inc., 251 P.3d 489, 498-99 (Colo.App.2010), for the argument that post-trial motions that affect post-judgment interest should be construed as Rule 59 motions. In Weize, the trial court reduced the rate of post-judgment interest after the time for ruling on Rule 59 motions had expired. Id. at 499. A division of this court held that, because "the correction was based on [the trial court's] statutory interpretation, not on a clerical mistake," the motion was properly construed as falling under Rule 59. Id. Therefore, the late order was void. Id.
¶ 70 But the deposit order here did not impact the correctness or "propriety of the judgment itself." Molitor, 795 P.2d at 268. And, unlike the trial court's order in Weize, it did not change the rate of interest. The order simply halted the accruing of interest and permitted the city to satisfy the judgment against it.
¶ 71 We also reject the manufacturer's argument that the city waived this issue on appeal. The manufacturer argues that (1) the city should have appealed the deemed denial of its post-trial motion; and (2) the city did not argue this issue in its opening brief. As we have discussed above, the motion to deposit funds with the court registry was not a "post-trial motion" for the purposes of Rule 59 and was not deemed denied. And, the absence of any discussion of this issue in the city's opening brief ignores the fact that the city is the cross-appellee on this issue, and, as such, it is entitled to defend the trial court's order in its combined answer-reply brief.
¶ 72 Therefore, after conducting our de novo review, we conclude that the trial court retained jurisdiction to enter this order authorizing the city to deposit funds in the court's registry and to toll the accruing of interest.
IV. The Trial Court Properly Granted the City's Motion to Deposit Funds
¶ 73 The manufacturer asserts that the trial court misinterpreted Colorado's tax appeal and interest statutes when it entered the deposit order and tolled the accruing of post judgment interest. It contends that the statute requires the city to retain the money until the conclusion of the appeal, while interest continues to accrue. We disagree, and we conclude that the trial court was authorized (1) to accept the city's satisfaction of the judgment by depositing the amount of the judgment award into the court registry; and (2) to toll the accruing of post judgment interest once the money was deposited.
A. Standard of Review
¶ 74 To the extent that the manufacturer asks us to review the trial court's interpretation of the taxation appeal and interest statutes, our review is de novo. Sperry v. Field, 205 P.3d 365, 367 (Colo.2009). "Because an interest statute is in derogation of the common law, the language of the statute must be strictly construed by the court." Id. (citing Rodriguez v. Schutt, 914 P.2d 921, 925 (Colo.1996) ). But if the statute is clear and unambiguous on its face, then we need look no further. Id.
¶ 75 Generally, a trial court's "grant of leave to deposit funds in the court registry is reviewed for an abuse of discretion." Rudnick v. Ferguson, 179 P.3d 26, 30 (Colo.App.2007).
B. Colorado's Interest Statute for Tax Appeals
¶ 76 Section 39-21-105, C.R.S.2012, provides for interest in tax cases. When a taxpayer appeals to the district court, the taxpayer may toll the running of interest by depositing the disputed amount with the executive director of the taxing authority. § 39-21-105(4)(b) ("If such amount is so deposited, no further interest shall accrue on the deficiency contested during the pendency of the action.").
¶ 77 The statute also provides:
At the conclusion of the action, after appeal to the supreme court or the court of *780 appeals or after the time for such appeal has expired, the funds deposited shall be, at the direction of the court, either retained by the executive director and applied against the deficiency or returned in whole or in part to the taxpayer with interest at the rate imposed under section 39 - 21 -110.5.
Id.
¶ 78 In turn, section 39-21-110.5, C.R.S.2012, provides for a market-based interest rate:
Except as otherwise provided ... the annual rate of interest shall be the prime rate, as reported by the "Wall Street Journal[,]"[ ] plus three points, rounded to the nearest full percent. In the event that more than one rate is so reported, the highest rate shall be utilized.
§ 39-21-110.5(2), C.R.S.2012.
¶ 79 At the time of this action, the interest rate under section 21 -110.5(2) was six percent. This statute is similar, but not identical, to other market-based interest statutes that the legislature has established for appealed judgments. See § 13-21-101(3), C.R.S.2012 (establishing a market-based rate for appealed personal injury lawsuits that is "two percentage points above the discount rate, which discount rate shall be the rate of interest a commercial bank pays to the federal reserve bank of Kansas City"); § 5-12-106, C.R.S.2012 (providing the same rate for appeals in non-personal injury cases).
¶ 80 Analyzing the personal injury interest statute, our supreme court has held that the market-based structure of the statute serves two main purposes: to "eliminate the financial incentive (or disincentive) to appeal"; and "to ensure that the judgment creditor whose satisfaction is delayed due to an unsuccessful appeal receives the time value of his or her money judgment." Rodriguez, 914 P.2d at 929. Because the provision here is similar to the personal injury interest statute, in that it utilizes a market-based rate, we may infer the same purposes. Conoco, 121 P.3d at 900 (applying Rodriguez in a tax case).
C. Analysis
¶ 81 The manufacturer contends that section 39-21-105(4)(b) prohibits the trial court from tolling post-judgment interest earlier than at the "conclusion of the action." We disagree, and we hold that the statute is silent concerning early satisfaction of a judgment. Therefore, it did not prohibit the trial court, under the circumstances of this case, from tolling the accruing of postjudgment interest on the funds that the city deposited in the court's registry under C.R.C.P. 67(a).
¶ 82 The manufacturer relies on the legislature's use of the words "at the conclusion of the action ." § 39-21-105(4)(b) (emphasis supplied). It asserts that the statute requires the city to keep the money until the action is completed. The manufacturer compares this provision with sections 5-12-106(1)(a) and 13-21-101(2)(a), C.R.S.2012, both of which state that "interest ... shall be payable ...until satisfaction of the judgment " (emphasis supplied).
¶ 83 But these other post judgment interest provisions are more detailed than section 39-21-105(4)(b). They directly address the timing of the accruing of interest by expressly stating that it will stop when the judgment is satisfied. See § 5-12-106(1)(a) ("[I]nterest ... shall be payable ...until satisfaction of the judgment ....")(emphasis supplied). Moreover, these statutes deal expressly with judgments that are appealed by judgment debtors . § 5-12-106(1)(a) ("If a judgment ... is appealed by a judgment debtor ...."); see also Averyt v. Wal-Mart Stores, Inc ., 2013 COA 10, ¶33, 302 P.3d 321, 2013 WL 174981.
¶ 84 In contrast, the provision here simply mandates that the taxing authority shall pay-at the very latest-at the conclusion of the action. It does not state that the conclusion of the action is the only time when the taxing jurisdiction may satisfy its judgment. And, because the manufacturer has cross-appealed on this issue, this case involves an appeal by a judgment creditor . Because we must construe interest statutes narrowly, Sperry, 205 P.3d at 367, we refuse to read into section 39-21-105(4)(b) a requirement that a taxing jurisdiction must retain its money during the entire appellate process while post judgment interest accrues.
*781 ¶ 85 Further, the manufacturer's interpretation conflicts with the general purposes of market-based interest statutes such as the one here. As our supreme court has stated, these statutes are intended to remove financial incentives and disincentives to appeals and to ensure that judgment creditors who are successful on appeal receive the time value of their money. See Rodriguez, 914 P.2d at 929.
¶ 86 To allow the manufacturer to use the interest statute as an investment tool would defeat these purposes. Here, (1) the city paid the judgment into the court's registry; and (2) the court's order allowed the manufacturer to access the money and to invest the money how it pleased. Thus, the city did not have an incentive to appeal that would disadvantage the manufacturer because the city paid the judgment before litigating the appeal. The deposit of the funds and the tolling of the accruing of post judgment interest removed any disincentive to the city's appeal because the city claimed that the six percent rate did not truly represent the city's investment market conditions. And the manufacturer was not denied the time value of its money during the appeal.
¶ 87 Moreover, although no Colorado case expressly discusses it, we conclude that C.R.C.P. 67(a) permits a trial court to toll the accruing of post judgment interest as of the time that the judgment creditor can gain access to the money deposited in the registry of the court. See Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 12 Federal Practice and Procedure § 2991 (2d ed. 2013) ("Under some circumstances[,] [ Rule 67 ] may suffice to stop the running of interest."). Our conclusion on this matter is supported by the supreme court's decision in In re Marriage of Gutfreund, 148 P.3d 136 (Colo.2006). In Gutfruend, the supreme court held that, under the general post judgment interest statutes, "a judgment is not satisfied until funds are accessible, and only at that point does the obligation to pay interest terminate." 148 P.3d at 140. We see no reason to eschew this logic as far as tax appeals are concerned, especially in light of the similar focus of the general post-judgment interest statutes on compensating judgment creditors.
¶ 88 Courts in other jurisdictions, construing versions of their rules that are similar or identical to C.R.C.P. 67(a), have reached the same result. See Cajun Elec. Power Co-op., Inc. v. Riley Stoker Corp. , 901 F.2d 441, 445 (5th Cir.1990) ("We have suggested that an actual deposit of funds pursuant to [ Rule 67 ] may stop the accrual of interest pending a final resolution of the rights of the parties...."); Fassbinder v. Pennsylvania R.R. Co. , 233 F.Supp. 574, 576 (W.D.Pa.1964) (" Rule 67... when read in conjunction with 28 U.S.C. § 2041, is certainly broad enough to authorize the payment into court of a judgment and costs in order to stop the running of interest thereon if such is desired."); Russo v. Sutton , 317 S.C. 441, 454 S.E.2d 895, 897 (1995) ("[W]e hold that to stop accrual of interest, a debtor must comply with the plain language of Rule 67."); Miga v. Jensen , 96 S.W.3d 207, 211 (Tex.2002) ("Postjudgment interest is not a punishment inflicted on a judgment debtor for exercising the right to appeal.... When a judgment creditor has received an unconditional tender of the money awarded, and may invest it as he chooses, there is no need for the continuing accrual of post judgment interest."); Crawford v. Amadio, 932 P.2d 1288, 1295 (Wyo.1997) ("This is one of those circumstances in which [the judgment debtor's] tender of payment was appropriate to 'stop the accrual of interest by authorizing a payment into the court.' ")(quoting Parker v. Artery, 889 P.2d 520, 527 (Wyo.1995) ).
¶ 89 The reasoning in these cases is persuasive, and, as a result, we conclude that we should be guided by those decisions here. See Garrigan v. Bowen, 243 P.3d 231, 235 (Colo.2010) ("Because the Colorado Rules of Civil Procedure are patterned on the federal rules, we may also look to the federal rules and decisions for guidance.").
¶ 90 Last, because we view the statutes that we have analyzed above as unambiguous, we do not address four questions that the manufacturer raises in its cross-appeal. In light of our resolution of this issue based on those statutes, those four questions now raise only hypothetical concerns that we do *782 not need to analyze to resolve this appeal. See Kemp v. Empire Sav., Bldg. & Loan Ass'n, 660 P.2d 899, 901 (Colo.1983) ("This court is not empowered to give advisory opinions based upon hypothetical situations.").
¶ 91 Therefore, the trial court properly accepted the city's payment pursuant to C.R.C.P. 67(a) and tolled the accruing of post judgment interest.
¶ 92 The judgment and order are affirmed.
JUDGE DAILEY and JUDGE GABRIEL concur.